BADISCHE ANILIN & SODA FABRIK v. KALLE & CO. et al.

(Circuit Court of Appeals, Second Circuit. October 16, 1900.)

No. 70.

1. PATENTS—ANTICIPATION—PRIOR PUBLICATIONS.
    A prior publication, referred to as an anticipation, must be given effect in accordance with what it actually communicates to the public, and expert testimony cannot be received for the purpose of showing that statements therein made were erroneous, and to give it the effect it would have if reconstructed so as to disclose matters which it might or should have stated, but which it in fact did not.

2. SAME—DYES—INDOINE BLUE.
    The Julius patent, No. 524,254, for "Safranine Azo Naphthol Lake," a blue dyestuff prepared from safranine azo naphthol, and which is soluble in water, and constitutes a cheap and valuable substitute for vegetable indigo, held not anticipated, valid, and infringed as to claims 1, 2, and 4.

Appeal from the Circuit Court of the United States for the Southern District of New York.

This case comes here upon appeal from an interlocutory decree of the circuit court, Southern district of New York (91 Fed. 163), sustaining a patent, finding infringement of claims 1, 2, and 4 thereof, and ordering an injunction and accounting. The relevant portions of the patent are as follows, the quotations covering everything therein contained which has been referred to by either side. United States letters patent No. 524,254, August 7, 1894 (application filed April 1, 1893), to Paul Julius, assignor to complainant, for "Safranine Azo Naphthol Lake," patented in England, No. 4.543, application March 13, 1891, issued January 2, 1892:

"The ultimate object of my invention consists in a new lake that may be produced as a pigment or upon fiber. It resembles vegetable indigo, in color and fastness against washing and light, so nearly as to form an artificial substitute for the same, such as has been sought for many years by chemists. In arriving at this new lake, I have made certain very essential intermediate discoveries or inventions, which I also desire to secure by this patent. Thus, I have discovered and recognized that a certain class of substances (safranine azo naphthol bodies), known as 'insoluble precipitates,' and regarded as worthless bodies, can be rendered soluble, and then constitute a most valuable dye, and I have proved this discovery by rendering them soluble (as hereinafter further explained), and have hereby enriched the dyeing industry with a cheap dye of most excellent properties, the application of which is founded on transforming it into the above said lake. The said insolubility of these safranine azo naphthol bodies, as hitherto obtained, was due to the presence of alkali and salts therein. These admixed impurities constitute a hindrance or obstacle preventing the solution of the bodies. I have further discovered that these phenolic azo dyes (the said safranine azo naphthol bodies) possess the character of bases, an exceptional characteristic possessed by no phenolic azo compound hitherto known. I have applied or used this surprising basic nature of these insoluble precipitates in two ways, viz.: First, I have taken advantage thereof to produce acid compounds or salts of the safranine azo naphthol bodies, whereby I destroyed the influence of the impurities hereinbefore referred to, to prevent the solution of the said bodies, and so obtained them in a soluble form, in a condition suitable for the use of the dyer; second, I have taken advantage of the aforementioned basic nature of the bodies to cause them to combine, when in soluble form, with tannic acid, and a metal such as antimony and iron, whereby I produced the valuable indigo-like lake.

"In the year 1885, a German patent, No. 38,310, was granted to the Leipziger Anilinfabrik Beyer & Kegel for the preparation of azo dyes by the combination of certain diazo safranines with naphthol sulpho acids. On account of their bad dyeing qualities, these proposed dyestuffs are worthless as such, and never came into commerce, and the patent was abandoned. The compounds resulting from the combination of the safranine diazo compounds with the unsulphonated naphthols have been mentioned in chemical literature as insoluble precipitates. They could not be applied in the dyeing industry, and have since been disregarded, and fallen into the rank of useless bodies, and were not included in the said German patent. * * *

"The following is an example of the manner in which my invention can be carried into effect, and the new dyestuff obtained. The parts are by weight. Make a one per cent. solution of safranine, taking one molecular proportion of the safranine used, say about seven (7) parts of safranine T, or about six and three-fifths (6.6) parts of pheno safranine, or about seven and seven-tenths (7.7) parts of dimethyl safranine. Diazotize by adding first a solution of sodium nitrite containing about fourteen (14) parts of that salt (one molecular proportion), and then twenty-three (23) parts of hydrochloric acid containing about thirty-three per cent. real acid (HCl). The solution during these operations must be kept cold with ice, and stirred. Next run the mixture into an ice-cold solution of about three (3) parts of naphthol—either alpha or beta—(one molecular proportion) in about one hundred and sixty (160) parts of water and twenty-five (25) parts of caustic soda solution, containing about thirty-five per cent. of sodium hydrate (NaOH), stir the mixture thoroughly for several hours, then filter off the blackish violet precipitate of safranine azo naphthol thus formed. Now wash well with cold water, prolonging this until the liquor running off is deeply colored, and shows that a soluble product has resulted.

The paste then remaining on the filter can be used in dyeing as such, or after making up to a standard strength. Or, without washing so thoroughly, my new dyestuff can also be prepared in the form of paste (in which form it best meets the requirements of dyers), as follows: Stir the azo body, obtained as above described, with a little water, and mix gradually with hydrochloric acid, until a test portion of the paste obtained is completely soluble in hot water. To prepare the new dyestuff from the quantities of safranine described in the above example, about two and one-fifth (2.2) parts of hydrochloric acid, containing about thirty-three per cent. of real hydrochloric acid (HCl), may be used at this stage of the process. The paste so obtained contains my new dyestuff in the form of a salt, and can be diluted or made up to a standard strength. Instead of hydrochloric acid, other acids may be used, such as acetic acid, sulphuric, nitric, oxalic, and tartaric acids; also salts which act as acids; but, of these, hydrochloric and acetic acids give the best results. * * * My new dyestuff, however prepared, is a soluble safranine azo naphthol body. It occurs in the dry form and in paste, and forms a dark-colored powder, with the slight metallic sheen giving a violet black paste. It is soluble in both hot and cold water, giving violet to blue solutions, insoluble in alkalies, soluble in alcohol, and practically insoluble, or very slightly soluble, in benzine. The dye can readily be recognized by its behavior on treatment with reducing agents, for safranine and amido naphthol occur in the reduction products. * * *

"I will now proceed to describe the new lake, and the manner of obtaining it:

"Example a. Dissolve about twenty parts of my new dyestuff in the form of powder (or the corresponding quantity of paste) in about two thousand parts of hot water, allow to cool, and then add a solution of about thirty parts of tannin in three hundred parts of water (or the equivalent quantity of an extract of sumac); finally add a solution of about eleven grams of tartar emetic in about one hundred and fifty parts of water, raise the temperature to the boiling point, and maintain this temperature for about fifteen minutes. Filter, while still hot, through a calico filter, wash well with about ten parts of cold water, press and dry the lake so obtained at a temperature of about seventy degrees centigrade.

"Example b. To obtain the lake on cotton fiber proceed as follows: Take the freshly boiled out goods, pass them six times through a boiling hot solution of sumac, and then leave them overnight in the liquid. Next wring out and pass about eight or ten times through a solution of antimony salt, wash well, and wring out. Now fill the dye vat with the necessary quantity of water, and add the amount of aluminium sulphate mentioned below, then enter the goods, and, after passing them through the liquid once or twice, remove, and wring them lightly by stretching. Add about one-eighth of the dye solution through a fine sieve, pass the goods again six times through the solution, then removing them, and, stretching as before, add again one-eighth of the dye solution, subsequently add a quarter of the dye solution, and finally the remainder thereof, manipulating in the same way. * * * The dyed goods are of a color resembling indigo, possess a degree of fastness to light and washing exceeding that obtainable with the ordinary analine dyes, and comparing advantageously with indigo itself. The coloring matter may be applied so as not to bleed into the white. In addition to the valuable and novel degree of fastness of color possessed by the lake prepared according to this invention, whether on the fiber or otherwise, it may be recognized by the following very characteristic reactions: * * *.

"What I claim as new, and desire to secure by letters patent, is: (1) As an article of manufacture, a coloring matter lake resembling indigo in color, which can be obtained by combining a soluble safranine azo naphthol body with a tanno metallic mordant, and which is very fast to light and washing. Upon suitable reduction, it shows the reactions of safranine; upon treatment with caustic soda, it shows the reactions of tannin; and it contains a metal, substantially as described. (2) As an article of manufacture, the herein-described blue dyestuff, which can be obtained from a safranine azo naphthol, and which may be recognized by the following characteristics: It is soluble in water; upon reduction with stannous chloride and hydrochloric acid, amido naphthol is produced; and upon reduction with zinc dust and acetic acid a safranine is

produced, substantially as described. (3) The process which consists in the treatment of a safranine azo naphthol with an acid until the body is rendered soluble in water, substantially as described. (4) The specific blue coloring matter (obtainable by rendering the safranine azo beta naphthol hereinbefore mentioned soluble in water), which possesses the following characteristics: It is soluble in water; gives a blackish green solution in sulphuric acid: and, on reduction, gives alpha amido beta naphthol and safranine proper, all substantially as described."

Claim 2 is for a dyestuff produced by the combination of diazotized safranine with alpha or beta naphthol. Claim 4 is for a dyestuff produced by the combination of diazotized safranine and beta naphthol. The chemical name of this dye of claims 2 and 4 is "Safranine Azo Beta Naphthol"; its commercial name is "Indoine Blue." Claim 1 is for the product (a lake) resulting from dyeing cotton mordanted with tannin and tartar emetic with the product of claims 2 and 4. Claim 3 is for a process of manufacturing the product of claims 2 and 4, and is not here in controversy; no charge of infringement is based upon it.

Henry P. Wells, for appellants.

Livingston Gifford, for appellee.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

LACOMBE, Circuit Judge (after stating the facts as above). It would certainly seem a work of supererogation to undertake to add anything to the exhaustive discussion of the issues in this cause which is found in the opinion of Judge Coxe, sitting at circuit. 94 Fed. 163. Inasmuch, however, as the record is voluminous, the briefs and arguments most elaborate, it may be well to indicate, as briefly as the nature of the case will admit, the reasons why we concur in his findings and conclusions.

Certain propositions are now either expressly conceded by both sides or are undisputed upon the proof. A preliminary statement of them will somewhat simplify the discussion.

The "earliest date of invention" is January 2, 1892, the date of the filing of the complete specification for the British patent. The chemical product safranine azo naphthol was old; the patent asserting, and the complainant contending, however, that the literature of the art discloses no prior safranine azo naphthol available as an anticipation which was soluble in water. It will, of course, be readily understood that a dyestuff which is insoluble in water is not as available in the art as is one which is water soluble. "I agree with the statement," says one of defendants' witnesses, "that the nonsulphonated compounds, when once prepared, cannot be dyed on account of their insolubility." The product in suit belongs to a group of chemical compounds prepared by the action of a diazo compound and an oxy, that is a phenolic body, which are referred to in the prior literature as insoluble in water; but prior to the patent it had been found that by the introduction of a sulpho-acid group they could be so transformed as to be rendered soluble for application in dyeing processes. The chemistry of this transformation need not be discussed here. It is sufficient to say that all the witnesses recognize two distinct varieties of azo dyes of the kind under discussion,—the unsulphonated and the sulphonated. Moreover, the solubility secured by sulphonation is gained at the cost of rendering the product unfit for cotton dyeing generally.

There is no prior American patent, and although the answer, as amended, sets up a prior use at Buffalo, N. Y., no evidence was produced to establish it. There is no proof which would warrant a conclusion that the patentee at the time of his application did not believe himself to be the original and first inventor or discoverer. Therefore, under section 4923, Rev. St. U. S., testimony tending to show knowledge or use in a foreign country need not be discussed. It will be sufficient to inquire if there is proof that Julius' invention was, prior to January 2, 1892, "patented or described in a printed publication"; and that description must be such as to show that the article described in the patent can be certainly arrived at by following the description (Atlantic Co. v. Parker, 16 Blatchf. 295, Fed. Cas. No. 625), without the assistance of local prior knowledge or local prior use in the foreign country where the description is published.

Much time and space have been devoted to an effort to establish "prior use" in Germany. Since such prior use, if established, would be no defense, under section 4923, it is difficult to understand why the record is thus incumbered. The various patents or publications on which defendants rely are the following:

### Holliday Patent.

British letters patent were granted April 14, 1881 (No. 1,637), to Thomas Holliday, of the firm of Read, Holliday & Sons, of Huddersfield, for an invention of "improvements in obtaining coloring matters for use in coloring cotton and other textile fabrics." This is the first printed publication on the subject of safranine azo naphthol as a coloring matter. The specification states:

"The improvements relate to the employment of the coal-tar color, known in commerce as 'safranine,' and which color I treat with nitrous acid, and combine the product with alpha or beta naphthol, or mixtures thereof, and which combination may be made in the presence of the fiber. As an example for carrying out these improvements, I prepare—First, a solution of, say, 2 parts of naphthol, 1 part of caustic soda, and 100 parts of water; secondly, a solution composed of 1 part of safranine in 1,000 parts of water, with two parts of muriatic acid, 22 degrees Beaume; to this latter solution add 10 parts of nitrite of soda solution, 30 degrees Beaume. I do not, however, confine myself to this means of azotizing, as other methods may be adopted. By mixing these respective solutions, the coloring matter will be precipitated. I prefer, in mixing these solutions, to add the second to the first, but this may be varied. The combination of the solutions in the presence of the fiber may be effected by first impregnating the fiber with the first-mentioned solution, and then with the second solution, and finally with an alkali, so as to fully develop the color. The order of the impregnations, as well as the strengths of the solutions, may be varied; care being taken that the azotized safranine, the naphthol, and the fiber are simultaneously present when an alkali operates to develop the color."

It will be noted that this patent calls for a combination to be "made in the presence of the fiber"; that is, the fiber is first impregnated with one constituent, and then with the other. This was at the time a common method for dyeing with colors which, in combination, were insoluble, and at that time no dyes were produced on the fiber save those which were insoluble in water. A direction, therefore, to dye in presence of the fiber may fairly be taken as a

declaration that the coloring matter is insoluble. The three experts who testified for the complainant all stated that they had repeatedly experimented, following the directions of this Holliday patent, and that the product was invariably insoluble in water. They were not cross-examined as to these experiments, nor did any witness for defendant's contradict them in this particular. Therefore, although the Holliday patent does not expressly state whether its product is soluble or insoluble, it must be understood to be water insoluble, and, indeed, defendants' brief seems to concede this. The Holliday patent, therefore, does not describe a water-soluble safranine azo naphthol.

Chemische Industrie 1882, p. 7.

This is a mere reference to the Holliday patent. It is not separately discussed in appellants' brief, and is referred to here solely to indicate that none of defendants' alleged anticipations have been overlooked.

The Moniteur Scientifique.

In September, 1885, the firm of Beyer & Kegel applied for a German patent in manner following:

"Preparation of New Blue Coloring Matters.

"It is known that the safranines obtainable from primary amines can be transformed with nitrous acid into diazo compounds. We have now found that the combinations of these diazotized safranines with phenols or its sulpho acids form dyestuffs, which are distinguished by a dark blue, indigo-like shade. We give the following examples: (1) 32 kg. pheno safranine are dissolved in a sufficient quantity of water, mixed with about 25 kg. muriatic acid, and converted into the hydrochlorate of the diazo compound by adding an aqueous solution of 7 kg. of sodium nitrite. This diazo compound is then poured into an alkaline solution of 22 kg. B-naphthol, whereby the coloring matter is formed. (2) In order to prepare a corresponding dyestuff from the safranine which is obtained by oxidation of diamidotoluol and a mixture of o. toluidin and aniline, we proceed as follows: 35 kg. of the safranine referred to are dissolved in water, and transformed into the corresponding diazo compound, with muriatic acid and 7 kg. of sodium nitrite. If this diazo compound is allowed to run into an alkaline solution of 35 kg. B-naphthol monosulphonate of soda (for instance, of the soda salt of the so-called 'Schaeffer Acid'), a blue dyestuff is formed, dyeing mordanted cotton indigo blue shades. Quite analogous results are obtained with phenol, resorcine, B-naphthol, the other naphthol monosulpho acids, and naphthol di and tri sulpho acids.

"Claim: Process for the preparation of blue dyestuffs, which are formed by combination of diazotized safranines of the said class with phenols or its sulpho acids."

The German patent office asked for more detailed statements, which, presumably, were furnished. Inspection of this application shows that it dealt with two distinct products,—the nonsulphonated, example 1, and the sulphonated, example 2. Opposition developed, and the Holliday patent was cited, whereupon Beyer & Kegel wrote to the patent office:

"We have noted and convinced ourselves that * * * the firm Read, Holliday & Sons have taken an English patent for azo c' ors by combination of diazo safranine and naphthols. * * * and see fr, a it that it is Holliday's only object to produce on the fiber the color insoluble in water from safranine and alpha and beta naphthol, or from mixtures of both. Now, according to our researches, two substances are formed by the action of diazo

safranines on the naphthols, one soluble in acid, and one insoluble, which can be separated by acids. Now, we use the coloring matter soluble in acid, whilst the insoluble one, which is probably identical with that of Holliday produced on the fiber, remains behind on filtration. But as now Holliday did actually first effect the combination of diazo safranines with naphthol, as we have convinced ourselves, we therefore withdraw our application for a patent for the combination of the diazo safranine with phenol, resorcine, alpha, and beta naphthol; but, on the other hand, there is probably hardly anything to be objected against the patenting of a process for the preparation of azo coloring matter from diazo safranines and the phenol or naphthol sulpho acids, such as are particularly mentioned in our patent application L 3,337 III., and the amines or their sulpho acids of the supplement patent L 3,337 III."

Thereupon the German patent office issued patent 38,310 to Beyer & Kegel for "process for the preparation of blue coloring matter by the combination of diazo safranines with naphthol sulpho acids"; the process set forth being that described in example 2 of the application supra. It contains a list of dyestuffs prepared under the patent, giving their shades, with a statement whether or not they are soluble in water,—presumably the further details required by the patent office. Inasmuch as the German patent, as issued, is confined to the sulphonated product, it is not available as an anticipation.

Applications for patents in Germany are confidential. They are not published, although their contents are divulged to persons seeking to oppose issue. For that reason this original German application is not set up as an anticipation. But in 1886 the Moniteur Scientifique, a French periodical, published what purported to be a copy of the German application of Beyer & Kegel. This translation need not be repeated here. It is substantially as set forth above, with the addition of a table or list of shades and constituents. In this list appears the following:

"Diazo safranine with:
    1 Mol. alpha naphthol:    Blue, insoluble in water.
      "    beta naphthol:    Blue, violet, insoluble in water."

The "description in a printed publication," therefore, which the Moniteur Scientifique discloses is the description of a safranine azo napthol insoluble in water, and therefore not an anticipation of the water-soluble product of the patent in suit. Defendants have introduced much testimony in a hopeless attempt to strike these words "insoluble in water" out of the description. There is no ambiguity in them which calls for expert enlightenment to interpret them. We have no hiatus to be filled by appeal to the general literature of the art. It would make no difference if the inevitable result of following the process of example 1 should be a water-soluble product. (The evidence by no means establishes this.) Nor would the knowledge or experience of any number of chemists (unpublished to the world) that the phrase was "erroneous," or "a mistake," or "an interpolation" change the situation. The "description in a printed publication" of the statute is to be found within the four corners of such printed publication. Judge Coxe tersely and accurately expresses the law and the reason for it in the following passage:

"The question is, what does the prior publication say? not what it might have said, or what it should have said. If prior patents and publications can

be reconstructed by extrinsic evidence to fit the exigencies of the case, the inquiry will no longer be confined to what the publication communicates to the public, but it will be transferred to an endeavor to ascertain what its author intended to communicate."

### Table in Schultz's Book, 1887–1890.

There is a tabulation in Prof. Schultz's "Chemie des Steinkohlentheers," in which appears the following:

#### Diazotized Base Safranine.

| Combination with | Technical name. | Literature. | Shade. | Reaction with conc. $H_2SO_4$ | Remarks. |
|---|---|---|---|---|---|
| Phenol. | | | Red violet. | Bluish green, with $H_2O$ first blue, then brownish. | |
| Resorcine. | | | Violet. | Green, with water first blue, then red. | |
| A. naphthol. | | German patent No. 38,310. | Blue. | Brown, with $H_2O$ green, blue, violet. | |
| B. naphthol. | | German patent No. 38,310. | Blue. | Dirty green, with water blue. | |

It is contended that the absence of any statement in the last column, headed "Remarks," and the statement of the shade, import that the product is water-soluble. Judge Coxe dismissed this from consideration as being a mere skeleton, falling far short of the clear and precise statement required by the law. Upon its face it refers to the product of "German patent No. 38,310," and that, as we have seen, was confined to the sulphonated product. It is immaterial to inquire what German chemists might have supposed that Prof. Schultz meant, nor what he now says he meant, nor what he really did mean, nor whether the reference to the German patent is a "mistake," nor whether it is, in the opinion of chemists, "absurd." Schultz confined the "description in [his] printed publication," not to the chemical products referred to in Beyer & Kegel's application, but to those which they were content to cover by their patent. Such reference cannot now be stricken out, and the limits which he thus, intentionally or not, set to his publication, cannot now be disturbed.

### Beyer & Kegel's French Patent.

This was issued October 31, 1885, for a "process for the production of dyestuffs derived from safranine." It covers process for both nonsulphonated and sulphonated products, in which respects it differs from the German patent. It contains no table or list giving shades and solubility of the different varieties of product. The material portion reads:

"(1) Dissolve 32 kg. of pheno safranine in the necessary quantity of water, add 25 kg. of muriatic acid [acide chlorhydrique], and form the diazo chloride by the addition of a watery solution of 7 kg. of nitrite of soda. By running

this diazo compound into an alkaline solution of 22 kg. of beta naphthol, the coloring matter is formed. (2) To produce a corresponding coloring matter from * * * [safranine T], proceed in the following manner: Dissolve 35 kg. of the mentioned safranine in water, and transform the same into the corresponding diazo compound by means of muriatic acid and 7 kg. of nitrite of sodium. By adding the formed diazo compound to an alkaline solution of 35 kg. of the soda salt of beta naphthol monosulfoacid (e. 9, the sodium salt of the acid known as Schaeffer's), a blue coloring matter is formed, which dyes mordanted cotton an indigo shade."

This second recipe, it will be perceived, deals with the sulphonated product, and it is of the product thereby produced that the statement is made that it "dyes mordanted cotton an indigo shade." Whatever implication as to solubility there may be in this last-quoted phrase therefore applies to this sulphonated product, not, as some of defendants' witnesses suggest, to the product of the first recipe. Indeed, the testimony of one of these witnesses as to the alleged "direct statements" of the French patent are so contrary to its text that it is difficult to believe he could have had the document before him when he testified. With the sulphonated product this case is not concerned. Discussion may be confined to the first recipe of this French patent. This recipe gives exact quantities, save in two particulars: It fails to state what percentage of acid is to be taken and what amount of what substance shall be used to produce the alkalinity of the "alkaline solution of 22 kg. beta naphthol." Alkalinity might be produced by caustic soda or by carbonate of soda, but it was known that naphthol would not dissolve in water with carbonate of soda alone; it will dissolve in water with caustic soda. Now, it is a fact established by the testimony in this case that, if the blank in this recipe be filled with a certain quantity of caustic soda alone (or with a certain other quantity of the same to produce solution, the alkalinity being thereafter preserved with carbonate of soda), the result will be water-soluble safranine azo naphthol; but, if the blank be filled with a certain larger quantity of caustic soda, the result will be water-insoluble safranine azo naphthol. Where, then, are we to turn for information as to how this blank should be filled when we are trying to defeat a patent by reference to what has taken place in a foreign country? Not to the individual experiences of foreign dyestuff makers, nor to the unpublished theories of foreign chemists, but to the literature of the art,—to the "description in a printed publication," which the statute calls for. The literature of the art of producing safranine azo naphthol is brief. Defendants' witness, Dr. Schweitzer, says:

"The English Holliday patent is the only one (prior to Julius) giving kind or quantity of alkali to be used in the preparation of safranine azo naphthol. This Holliday patent is the first printed publication on the subject. The subsequent publications do not mention the quantities or qualities any more, because these details were unnecessary for everybody skilled in the art at the date of those publications."

Individual experimenters might, in the light of information derived from their own experience or from the general literature of chemistry, have used, some one quantity, some another, when practicing the first recipe of the French patent; but certainly one skilled in the

art would be expected to determine the "kind and quantity" unspeci-
fied therein by reference to the authoritative literature already quot-
ed.   If he did so, and used the kind and quantity specified in the
Holliday patent, he would inevitably get a water-insoluble product,
which is precisely what he would expect to get, because recipe 1
of the Beyer & Kegel French patent is substantially identical with
recipe 1 of the Beyer & Kegel application as published in the Moni-
teur Scientifique, and that publication itself declares that the product
is water insoluble.   The description in the French patent, therefore,
when completed by the descriptions in the other printed publications
which treat of safranine azo naphthol, does not disclose the invention
of Julius.

### The Agenda and the Textile Colorist.

The Agenda du Chemiste is a French periodical, which in 1890 pub-
lished an article on azo colors.   In September, 1890, the Textile
Colorist, a periodical issued in Philadelphia, published a translation,
or, to speak more accurately, a paraphrase, of this article.   During
the cross-examination of one of complainant's witnesses the article
in the Agenda was produced, a translation verified, and both put in
evidence; the witness being examined thereon at considerable length.
After all the testimony was closed and printed, and the case was on
the calendar ready for final hearing, defendants' counsel applied to
the circuit court (the writer of this opinion then sitting) for leave to
reopen the case to put in the article from the Textile Colorist, and to
take further testimony thereon.   The expressed ground for this ap-
plication was that by reason of inadvertent mistakes of translation
the article in the Textile Colorist, although purporting to be a copy,
conveyed a different meaning from the meaning of the article in the
Agenda, already in evidence.   Upon an examination of the two arti-
cles the court was not satisfied as to the truth of this assertion.
Nevertheless, since they were not textually identical, it was deemed
best to grant the motion.   The case was thereupon reopened, the
article put in evidence, and testimony taken, the cause going over to
the ensuing term.   The result is thus stated in the brief of defend-
ants' counsel: "With the exception of the first paragraph of the
Agenda, which is omitted in the Textile Colorist, the two are iden-
tical."   It will be sufficient, therefore, to quote from the Agenda:

### "Colors Formed Directly on the Fiber.

"The greater number of the azo derivatives employed in dyeing are sulpho
derivatives, and this introduction of a sulpho group into their molecule has for
its purpose to render them soluble in water, and to permit of their use in dye-
ing.   For several years it has been sought to produce these compounds directly
on the fiber, by a successive impregnation with the diazo derivative, and then
with the phenol or naphthol, which develop the desired shade by their combina-
tion.   The ingrain colors of Brooke, Simpson & Spiller, which contain as basis
the primuline, a derivative of thiotoluidine, are the first examples of this class
of products.   The pieces of cotton exhibited in the show case of Mr. Horace
Koechlin have demonstrated that the reaction giving rise to the azo derivatives
can be accomplished on the tissue as smoothly as in the vat of the factory, and
that one also obtains perfectly even and regular dyeings.   Mr. Horace Koech-
lin. aided by M. Georges Galland, has found that to insure success it is neces-
sary to invert the usual order of the operations, by first impregnating the
cloth with the phenol, and afterwards with the diazo solution.   For instance,

one impregnates the cotton tissue first with B-naphthol. 25 gr.; caustic soda at 38°, 25 gr.; water, 1 litre. One pads, one dries in the hot flue, and one passes for thirty seconds through the following diazo baths made by mingling the three solutions mentioned, in the order given. * * *

"Blue:

| | | |
|---|---|---|
| 1st. | Safranine of 10 p. c. | 1 litre. |
| | Hydrochloric acid | 75 gr. |
| 2d. | Nitrite of soda | 20 gr. |
| | Water | ⅛ litre. |
| | Ice | 250 gr. |
| 3d. | Acetate of soda | 250 gr. |
| | Water | 2 litres." |

The full text of this article thus quoted seems to be a complete answer to the far-fetched inference, sought to be drawn by defendants, that it contains a description of a water-soluble dyestuff formed in substance; that is, as a separate product apart from the fiber. From the beginning to the end of the article it deals with formation on the fiber, first produced by Brooke, Simpson & Spiller, and improved upon by Koechlin. There are two references only to any other process,—one (in the first paragraph), to the sulphonated group; the other, a bare statement of the fact that the reaction which gives rise to azo derivatives can be accomplished in the vat of the factory. Manifestly, this last reference is to a reaction already known, and, since the result of following the process of the Agenda is to produce a water-insoluble product on the fiber, the "reaction accomplished" in the vat "as smoothly" must refer to a reaction giving a like product in substance. Certainly, this Agenda article contains no description of a water-soluble safranine azo naphthol.

### Other Prior Publications.

An article in the Textile Colorist for 1887 is referred to in the brief as giving precisely the treatment prescribed in the acid portion of the patent in suit. We find no evidence sustaining this proposition, and the article itself shows that it refers to those bodies which "are by treatment with sulphuric acid transformed into sulpho acids," —the sulphonated group, with which we are not here concerned.

Two remaining prior publications, viz. Friedlander's Fortschritte and Andressen in Berichte, have not been discussed in appellants' brief, and therefore need not be here considered.

The next branch of the case presents the question of invention. That is sufficiently disposed of in the exhaustive discussion contained in Judge Coxe's opinion. He has stated every argument suggested in defendants' testimony fairly, fully, and more forcibly than do the witnesses themselves. Having thus summarized the argument against invention, he answers it clearly, categorically, and comprehensively. The entire discussion is too long to quote here; to undertake to give excerpts from it would not fairly present the argument. It is sufficient to say that we concur fully in his findings and in his conclusions.

Besides a reiteration of the arguments thus disposed of at circuit, —upon which appellants' counsel has, as he was entitled to, asked the opinion of this court,—he criticises Judge Coxe's reasoning as being founded on a fundamental misapprehension. The brief contains these statements:

"The learned judge [must have] supposed that the color in suit was the first and only coal tar derived substitute for vegetable indigo, to say nothing of the supposition that safranine azo beta naphthol of the prior art was a worthless body. Both suppositions were completely contrary to the fact. * * * It is to these misapprehensions, particularly the misapprehension that the complainant's color stood alone in the art as a substitute for vegetable indigo, and was its first known substitute, that defendants largely attribute his decision in favor of the patent."

The evidence in this case abundantly shows that the *water-insoluble* safranine azo beta naphthol of the prior art (the italicized words are carefully omitted in the brief quoted from) was, as Judge Coxe called it, "a comparatively worthless and neglected body." There is no warrant for the supposition that the judge supposed that the "color in suit was the first and only coal tar derived substitute for vegetable indigo." What he said in the opinion is this:

"To produce a cheap, artificial soluble substitute for indigo, possessing many of its advantages, and in some respects superior to indigo, was surely no mean achievement. Learned chemists in Germany and England, and probably in other countries, had long been experimenting to produce a result the importance of which was universally recognized, but Julius was the first to succeed."

Defendant enumerates many "coal tar derived substitutes for vegetable indigo, all blue cotton dyes," including alizarine blue. None the less the statement in the opinion is accurate. Alizarine blue is dyed with a more expensive mordant. Some of these enumerated dyes are inferior in fastness to air, or to water, or to soap, or in cheapness, or in convenience of dyeing, or in shade, or otherwise. No one of them is indicated which combines as many resemblances to indigo as does the color in suit. The most persuasive evidence to the fact that Indoine Blue is a substitute for indigo so superior to others as to justify all that Judge Coxe has said of it is found in this record itself, where a determined, acrimonious, persistent, and extended assault upon the validity of the patent has been made by 11 expert witnesses marshaled by the defendants and by other infringers. It is not usual to go to such trouble and expense to get a product out of the monopoly of a patent if it be only one of a large class all equally available to the manufacturer. The Bengaline Blue of defendants is identical with the Indoine Blue of complainant, and we find nothing in the record to challenge the accuracy of the following statements which defendants publish of this dyestuff:

"The newest and most perfect substitute for indigo on cotton, [requiring] only about half the quantities of these mordants necessary for other basic aniline colors." "The resistance to strong boiling alkalies or acids far exceeds vat-dyed indigo, and the cost of dyeing is from 33 to 50 per cent. less (according to shade) than indigo vat. The fastness to light, air, rain, etc., is most remarkable."

The identity of defendants' Bengaline Blue with the product of claims 2 and 4 is overwhelmingly established. In selling this product with directions for producing the lake of claim 1, and promoting such sales by distributing sample swatches thus dyed, they also infringe claim 1. The decree of the circuit court is sustained, with costs.