KUEHMSTED v. FARBENFABRIKEN OF ELBERFELD CO.

(Circuit Court of Appeals, Seventh Circuit.    May 11, 1910.
Rehearing Denied July 7, 1910.)

No. 1,639.

1. PATENTS (§ 45*)—PATENTABILITY—CHEMICAL COMPOUNDS—NOVELTY—EVIDENCE.

That a chemical compound is not a new article of manufacture in a patentable sense is not conclusively shown by the fact of a prior known compound having the same formula.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 51; Dec. Dig. § 45.*]

2. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—ASPIRIN.

The Hoffman patent, No. 644,077, for acetyl salicylic acid, known medically as "aspirin," is for the product of a new process, which for the first time produced it in a sufficiently pure state to render it therapeutically available, and is valid; also *held* infringed.

Appeal from the Circuit Court of the United States for the Northern District of Illinois.

Suit in equity by the Farbenfabriken of Elberfeld Company against Edward A. Kuehmsted. Decree for complainant (171 Fed. 887), and defendant appeals. Affirmed.

The appeal is from a decree of the Circuit Court sustaining patent No. 644,077, issued February 27, 1900, on an application filed August 1, 1898, to Felix Hoffmann of Elberfeld, Germany, assignor to appellee; finding appellant an infringer thereof; and granting an injunction. The essential portion of the letters patent is as follows:

"In the Annalen der Chemie und Pharmacie, Vol. 150, pages 11 and 12, Kraut has described that he obtained by the action of acetyl chlorid on salicylic acid a body which he thought to be acetyl salicylic acid. I have now found that on heating salicylic acid with acetic anhydride a body is obtained the properties of which are perfectly different from those of the body described by Kraut. According to my researches the body obtained by means of my new process is undoubtedly the real acetyl salicylic acid:

$$C_6H_4 \begin{array}{l} /OCO.CH_3 \\ \backslash COOH. \end{array}$$

"Therefore the compound described by Kraut cannot be the real acetyl salicylic acid, but is another compound. In the following I point out specifically the principal differences between my new compound and the body described by Kraut.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

"If the Kraut product is boiled even for a long while with water, (according to Kraut's statement,) acetic acid is not produced, while my new body when boiled with water is readily split up, acetic and salicylic acid being produced. The watery solution of the Kraut body shows the same behavior on the addition of a small quantity of ferric chlorid as a watery solution of salicylic acid when mixed with a small quantity of ferric chlorid—that is to say, it assumes a violet color. On the contrary, a watery solution of my new body when mixed with ferric chlorid does not assume a violet color. If a melted test portion of the Kraut body is allowed to cool, it begins to solidify (according to Kraut's statement) at from 118° to 118.5° centigrade, while a melted test portion of my product solidifies at about 70° centigrade. The melting-points of the two compounds cannot be compared, because Kraut does not give the melting-point of his compound. It follows from these details that the two compounds are absolutely different.

"In producing my new compound I can proceed as follows, (without limiting myself to the particulars given): A mixture prepared from fifty parts of salicylic acid and seventy-five parts of acetic anhydride is heated for about two hours at about 150° centigrade in a vessel provided with a reflux condenser. Thus a clear liquid is obtained, from which on cooling a crystalline mass is separated, which is the acetyl salicylic acid. It is freed from the acetic anhydride by pressing and then recrystallized from dry chloroform. The acid is thus obtained in the shape of glittering white needles melting at about 135° centigrade, which are easily soluble in benzene, alcohol, glacial acetic acid, and chloroform, but difficultly soluble in cold water. It has the formula

$$C_6H_4\begin{array}{l}\diagup OCOCH_3 \\ \diagdown COOH.\end{array}$$

and exhibits therapeutical properties."

And the claim is as follows:

"As a new article of manufacture the acetyl salicylic acid having the formula:

$$C_6H_4\begin{array}{l}\diagup O.COCH_3 \\ \diagdown COOH.\end{array}$$

being when crystallized from dry chloroform in the shape of white glittering needles, easily soluble in benzene, alcohol and glacial acetic acid, difficultly soluble in cold water, being split by hot water into acetic acid and salicylic acid, melting at about 135° centigrade, substantially as hereinbefore described."

The appellant sells an article having an identical formula and responding to the characteristics set forth in the claim—that being the sole proof of infringement (appellant's process not being shown) upon which appellee obtained the decree appealed from.

Further facts are stated in the opinion.

John G. Elliott, for appellant.

Livingston Gifford and Anthony Gref, for appellee.

Before GROSSCUP, BAKER, and KOHLSAAT, Circuit Judges.

GROSSCUP, Circuit Judge, after stating the facts as above, delivered the opinion:

The so-called new article of manufacture is known in the trade as "Aspirin," a well-known medicine; a medicine today that has an output in this country of two million ounces per year, standing next to quinine as the best selling medicine on the market. It is recognized as an "ethical remedy," being prescribed by physicians. No medicine, possessing the physiological properties of aspirin, was before known. As an article of manufacture in the line of therapeutics, whatever may

have been its antecedents chemically, aspirin therefore is a new thing. Is it a new article of manufacture within the meaning of the patent law? That is the first question before us.

In his letters patent, Hoffmann says:

"Kraut has described that he obtained by the action of acetyl chlorid on salicylic acid a body which he thought to be acetyl salicylic acid. I have now found that on heating salicylic acid with acetic anhydride a body is obtained the properties of which are perfectly different from those of the body described by Kraut. According to my researches the body obtained by means of my new process is undoubtedly the real acetyl salicylic acid,

$$C_6H_4 \begin{array}{l} /OCO.CH_3 \\ \backslash COOH. \end{array}$$

"Therefore the compound described by Kraut cannot be the real acetyl salicylic acid, but is another compound."

This the appellant challenges, the challenge being founded, not upon the contention that appellee's "body" therapeutically is not different from the Kraut "body," or its other antecedents, but that the two bodies chemically are the same; shown (a) by the fact that the formulae are the same, and (b) that the two bodies respond to the same tests. And upon these contentions, as premises, appellant insists that aspirin is nothing more than Kraut's acetyl salicylic acid "purified."

The fact that the formulae are identical cuts little figure. A chemical formula is simply the symbolical expression of the composition or constitution of a substance; as the formula for water is $H_2O$ (Webster's New Unabridged International Dictionary). Customarily, chemists who intend to produce a combination of two substances write the formula of the product in advance of making it. (Professor Haines, expert for the appellant.) "Without doubt, processes have been described in chemical publications which give products differing somewhat in their chemical structure and name from those which the writer supposed would be produced," or which give the formulated product "only in conjunction with other substances so that the total product obtained at the end of the process is not correctly represented or entirely represented by the structural formula or chemical name given." (Haines.) "It is quite customary for chemists to predict the structural constitution of substances which they endeavor to produce, and they are often surprised when the result of their prediction exhibits quite a different and totally unexpected constitution, or when the process which they have ingeniously contrived fails to produce any satisfactory result whatever. * * * The great chemist Perkin started out over fifty years ago to produce quinine synthetically and was surprised to find that, instead of producing quinine, he produced a beautiful purple dye stuff, mauve, which laid the foundation for the great coaltar industry, and other great developments which grew from it." (Dr. Chandler, expert for appellee.) And, assuming that the formula actually expresses the constitution of the substance chemically, the substance physically, and in consequence therapeutically, may be widely different, as, for instance, the water of the seas, differs, in its physical body, from the water of certain springs, though the chemical formula for "water," whether of sea or spring, is $H_2O$. That is to say, two

substances, having the same chemical formula, may differ widely, as to impurities, upon qualitative analysis.

So much for identity of formula. What about Kraut's body responding to the tests laid down in the patent? Aspirin, when boiled with water, is readily split up, acetic and salicylic acid being produced, this being one of its characteristics. On the contrary, according to Kraut's statements, if the Kraut product is boiled with water, even for a long while, acetic acid is not produced. But appellant insists, that notwithstanding this statement of Kraut, he (appellant) can take the Kraut body, and by subjecting it to a process in which boiling in water intervenes (as distinguished from the entirely dry process described in the patent), obtain a product responding to the characteristics of aspirin. But how does he do this? Enlightened by the disclosures of the Hoffmann patent that the product is decomposed by boiling in water, he avoids, as far as possible, this effect by hastening the process—dissolving in water already boiling, rapidly cooling by artificial means, and by pouring off the supernatant liquid (still containing over fifty per centum of the product) in order to rescue the product already crystallized from further contact with the water. This process was repeated from three to five times, in addition to hastening dissolution by finely dividing the crystalline mass and by stirring. Appellant thereby obtained a substantially pure product, amounting to less than half the original crystalline mass, or less than half the amount obtainable under the Hoffmann process. This, to our minds, is not proof that Kraut's body is Hoffmann's body, but only that Kraut's body can be so treated, apart from the dry process pure and simple, that it will yield some portions corresponding to Hoffmann's body.

But assuming that the compounds, chemically, are not different—that the two bodies are analytically the same—Hoffmann's recrystallized product is therapeutically different from the Kraut and antecedent products in the following undisputed particulars: It was long known that salicylic acid was the best remedy for rheumatism, and was also anti-neuralgic and anti-pyretic; that when taken internally in a free state it was injurious to the stomachs of all patients, and particularly so to those the physiological action of whose stomachs were idiosyncratic; and that for a long time attempts were made to overcome this pernicious quality of salicylic acid and at the same time retain its beneficent effects, but without ultimate success until the discovery by Hoffmann of the resulting product of the patent in suit. In the Hoffmann product all the salicylic acid is held entirely in bond while passing through the stomach, where it would do harm, and is set free in the intestines, where its utility as a therapeutical agent is rendered effectual—the acetyl molecule or radical, unaffected by the acid fluids of the stomach, being split off or set free by the alkaline fluids of the intestines—thus making the Hoffmann product practically effective and safe in its therapeutical results as against what previously had been undesirable or unsafe, if effective at all, in therapeutics.

Hoffmann has produced a medicine indisputably beneficial to mankind—something new in a useful art, such as our patent policy was intended to promote. Kraut and his contemporaries, on the other hand, had produced only, at best, a chemical compound in an impure state. And it makes no difference, so far as patentability is concerned, that the medicine thus produced is lifted out of a mass that contained, chemically, the compound; for, though the difference between Hoffmann and Kraut be one of purification only—strictly marking the line, however, where the one is therapeutically available and the others were therapeutically unavailable—patentability would follow. In the one case the mass is made to yield something to the useful arts; in the other case what is yielded is chiefly interesting as a fact in chemical learning. Merrill v. Youmans, 94 U. S. 569, 24 L. Ed. 235; Badische v. Kalle, 104 Fed. 802, 44 C. C. A. 201 (C. C. A. 2d Circuit); Badische v. Klipstein (C. C.) 125 Fed. 543.

Upon the question of infringement, appellant offered no explanation of how the product which he sold was obtained, but testified that he sold it as the same chemical product as aspirin and a substitute for aspirin. What the evidence before us shows is, that it is in chemical characteristics the exact article that appellee has patented. The fact that the "ear marks" showing this are chemical instead of physical, such as color, shape or the like, or some characteristic disclosed by taste, smell or the like, makes no difference. They are none the less, so far as the facts in this case have been brought to our attention, true "ear marks" of aspirin—the product of appellee—and therefore, in the absence of explanation, at least, establish identity. In other words, aspirin stands, upon the facts before us, as a new article of manufacture produced by appellee's patent, and the product sold by appellant stands, upon the proof before us, as identical with it; wherefore, his sale of it is an infringement of appellee's product.

The decree of the Circuit Court is affirmed.

KOHLSAAT, Circuit Judge (concurring). Kraut in 1869 found that Von Gilm's so-called acetyl salicylic acid of 1859, obtained by treating the acids with acetyl chloride, and purified by recrystallizing from boiling water, responded to the same tests as Gerhardt's product resulting from the action of chloracetyl on sodium salicylate, extracted with ether and recrystallized from boiling water. He also found that the mass so produced was easily dissolved in wine spirits, ether, and benzole, viz., these are given as purifying substances. Hoffmann provides for a mixture of salicylic acid and acetic anhydride subjected to heat. It does not appear that the mass so produced differs from those described by Kraut. Hoffmann then presses out the anhydride and recrystallizes from dry chloroform. His claim for novelty over the Kraut, Gilm, and Gerhardt products, is based upon the fact, as claimed, that his result responds to certain tests, to which the others do not purport to respond, and that the others give certain features which disclose impurity, and masses entirely different from his.

Hoffmann fixes his solidifying point at 70 degrees Centigrade; while Kraut fixes his at 118 degrees to 118.5 Centigrade.

The evidence favors the Kraut figure, and Hoffmann is not sure enough of his to include it in his tests. Kraut, as was the custom in 1869, fails to give any melting point. Hoffmann, in 1898, fixes the melting point of his product at 135 Centigrade, which element he enumerates as one of his tests. He also states that his new body, when boiled with water, is readily split up, acetic and salicylic acid being produced, and quotes Kraut as saying that if the Kraut product be boiled even for a long time with water, acetic acid is not produced. What Kraut did in fact say is that:

"They dissolve very little in cold water, melt on heating with water, to an oil, which, even with prolonged boiling with water, allows no acetic acid to escape and suffers no noticeable decomposition at all."

The grammatical arrangement of this statement seems to be somewhat involved. The word "they" may refer to the products or bodies produced by his two methods, or it may refer to the white needles. The word "which" would seem to apply to the oil produced by boiling the mass, though complainant and Prof. Haines seem to apply it to the two bodies being dealt with. The latter construction seems strained, in view of the fact that it is used in connection with the singular verbs "allows" and "suffers."

Kraut says that his aqueous solution colors iron chlorid like salicylic acid. This defendant insists must refer to the solution accompanying the oil resulting from heating with water. It is difficult to account for this on any other ground than that Kraut's product, when boiled with water does decompose and produce acetic acid. At any rate, so defendant asserts, Hoffmann is not justified in his statement that Kraut says acetic acid is not produced by boiling his product for a long time with water, since what Kraut in fact says is that the oil produced by prolonged boiling with water, does not throw off acetic acid or appreciably decompose. Each of the three masses dealt with by Kraut and Hoffmann, it appears from the record, does give out, on boiling with water, an oil which is "settled off." Kraut distinctly does not say, defendant insists, that acetic acid is not produced in the course of the treatment of his product as above. This seems to be the reasonable import of his language.

Notwithstanding the foregoing, defendant's witness Haines (page 116 of record) says:

"In regard to two points, Kraut's description of acetyl salicylic acid is somewhat misleading. The first of these is in regard to the effect of boiling water on the compound. He describes with perfect accuracy what he undoubtedly observed, viz., that in boiling the acid with water, it suffers no noticeable decomposition and allows no acetic acid to escape, although, as a matter of fact, it is slowly decomposed by hot water. This decomposition, however, is easily overlooked. If a little of the perfectly pure acid is boiled with water, no decomposition is seen by the unaided eye, and there is no odor of escaping acetic acid unless a considerable amount of material is acted on, and even then the odor might be easily overlooked, if one's sense of smell was not naturally acute, or if one was suffering from a little catarrhal cold. * * * The second point in Kraut's description of acetyl salicylic acid which is somewhat misleading is his statement that its aqueous solution strikes a color with iron chloride like that produced with salicylic acid. * * * It was the presence in Kraut's product of a little free salicylic acid, either orig-

inally present or developed by dissolving in hot water, or both, that undoubtedly misled him."

Inasmuch as response to tests seems to be a fair method of determining the lack of identity of the product of the patent in suit with Kraut's product, it becomes important that the results of the tests should correspond in all material respects. If the construction placed upon Kraut's language by defendant's expert is to prevail over what might seem to be the unskilled judgment of counsel and court in that respect, it follows that the language of the patent in suit with reference to Kraut's article is justified, and that, failing to meet these material tests, the latter cannot be said to correspond to Hoffmann's product. Thus, while Kraut seems to have pointed out the method of obtaining a practically pure acetyl salicylic acid by the boiling water process, giving ether, wine spirits, and benzole as solvents—that is, dry solvents—it appears that in two important respects his language is misleading. It is evident that he was not principally concerned with obtaining the pure article, nor with anticipating Hoffmann's tests. He does not give a process which can be said to lead one skilled in the art to the product of Hoffmann, if his language is to be followed literally. Something has to be supplied before Kraut's product can be deemed to meet Hoffmann's decomposition test. That the crystal needles in both cases, Kraut's and Hoffmann's, are practically the same, differing, if at all, in degree of purity, admits of little doubt.

The record discloses attempts to demonstrate their actual identity, but these are not produced in such shape as to avail the appellant. Courts place little weight on ex parte demonstrations in any case, but especially is this true with regard to experiments with chemicals. Speaking therapeutically, it is of course desirable that the acetyl salicylic acid be pure; that is, substantially so. Aspirin is nothing more than this. So long as there is no appreciable amount of free salicylic acid in the product, the beneficial effects of salicylic acid are preserved. Had Kraut produced pure acetyl salicylic acid, he would have anticipated aspirin—no matter by what name it is called. The evidence is that a substantially pure article will suffice. Kraut claims to have produced a 98 per cent. article, according to his baryta titration test. The efficiency of this test is disputed. It may be conceded therapeutically that purity is a patentable advance over practical purity, but it is a very narrow advance. Acetyl salicylic acid, obtained by Kraut's process—that is, the article produced by water, or the ether, benzole, or wine spirits crystallization—belongs to the public, whether pure or only approximately so; and, had appellant shown that he was employing these methods, he could not have been held to infringe. On the contrary, the tests called for by the patent apply to defendant's product and do not apply to Kraut's. It surely was within appellant's power to rebut the presumption arising from these facts, had the Kraut processes been employed by him, but no attempt has been made to do so. There would seem to be in this a suggestion that the process rather than the product should have been claimed. Whatever this leads to, it still is true that so far as the record shows, Hoffmann's product is different from Kraut's, and there-

fore not anticipated or in the possession of the public prior to the filing of his application.

For these reasons, I concur in the conclusion of the majority of the court.