UNION CARBIDE CO. v. AMERICAN CARBOLITE CO.

(Circuit Court, N. D. Illinois, E. D.   March 8, 1911.)

No. 29,320.

1. PATENTS (§ 328*)—CONSTRUCTION AND INFRINGEMENT—"CRYSTALLINE CALCIUM CARBIDE."

 The Willson patent, No. 541,138, for "crystalline calcium carbide, existing as masses of aggregate crystals," *held*, on a motion for preliminary injunction, to cover calcium carbide existing as a mass of crystal grains, devoid of their characteristic forms and closely packed together, termed a "crystalline aggregate," if not crystalline calcium carbide in any form, and an injunction granted.

2. WORDS AND PHRASES—"AMORPHOUS."

 Calcium carbide in an "amorphous" condition is without definite form, or uncrystallized.

In Equity.  Suit by the Union Carbide Company against the American Carbolite Company.  On motion for preliminary injunction.  Motion granted.

Offield, Towle & Linthicum and Sears, Meagher & Whitney (James F. Meagher and Charles K. Offield, of counsel), for complainant.

Robert H. Parkinson, for defendant.

KOHLSAAT, Circuit Judge.  This suit was brought to restrain defendant from infringing product patent No. 541,138, granted to Thomas L. Willson on June 18, 1895, for crystalline calcium carbide, existing as masses of aggregated crystals.  Subsequently, by supplemental bill complainant seeks to restrain infringement of patent No. 708,921, granted to Roberts on September 9, 1902.  The cause is now before the court on motion for preliminary injunction upon the bill, supplemental bill, and affidavits of complainant and the answers and reply affidavits of defendant.  The original patent was sustained by the United States Circuit Court of Appeals for the Second Circuit in Union Carbide Company v. American Carbide Company, 181 Fed. 104–110, and an accounting ordered.  Under the facts hereof and the rule of law prevailing in such a case, the adjudication in the second circuit must be accepted as final upon the question of validity for the purposes of this hearing.  Electric Mfg. Co. v. Edison Electric Co., 61 Fed. 834, 10 C. C. A. 106.  The one claim of the patent reads, as above stated, viz.:

"As a new product, crystalline calcium carbide existing as masses of aggregate crystals, substantially as described."

The court for the second circuit states in its opinion that the presence of crystals in defendant's carbide was admitted.  Here its existence in defendant's carbolite is denied.  Whether or not the two products, i. e. that of the second circuit court and this, are identical, is a matter of dispute here.  The defenses raised on this motion, so far as it is deemed necessary to consider them, may be summarized as follows, viz.:  (1) That complainant has been guilty of laches in bringing suit.  (2) The defendant does not infringe the patent when prop-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

erly construed. (3) That the validity of letters patent No. 708,921 has never been adjudicated.

It appears from the record that defendant and its predecessor have been manufacturing and marketing their article of carbolite for about seven years with the full knowledge of complainant; that on about June, 1906, complainant brought suit in the Circuit Court of the United States for the Northern District of New York against the Nichols Gas Company, a gas company located in a small New York town, a customer of defendant's predecessor, for infringement of the complainant's patent. Defendant's predecessor conducted the defense of this suit in order to protect itself. An answer was filed, a large amount of evidence was taken at great expense and effort, covering the period from June, 1906, to May, 1909, when defendant had rested its defense and was awaiting the close of rebuttal testimony, on which latter date complainant dismissed its said suit over defendant's protest, and thereupon proceeded to press the American Carbide Company Case, above cited, the decision in which is relied on as establishing the validity of the patent herein. It appears that defendant in that case was not in any way connected with this defendant, nor did this defendant participate in that defense. Afterwards, defendant unsuccessfully solicited complainant to bring a new suit against it, offering to enter its appearance in the proper district, admit the manufacture of the alleged infringing product, stipulate the evidence of the dismissed suit into the record, and have the court settle the whole matter on the merits, which offer was rejected.

From the foregoing facts, it is apparent that complainant must have discovered the necessity for relief in limine quite recently.

[1] With regard to the scope of the patent, it appears from the file wrapper and contents in evidence that on March 4, 1895, the patentee herein filed his application in the patent office for the allowance of a claim reading:

"(1) As a new product, crystalline calcium carbide, having a bluish iridescence, substantially as described."

The examiner rejected the claim, citing patent No. 492,377, granted February 21, 1893, to the same patentee as in the patent in suit, and certain publications described as "Comptes rendus, vol. 119, p. 16, July 2, 1894," and "Roscoe & Schorlemmer's Treatise on Chemistry, vol. III, part II," in the former of which publications calcium carbide is referred to as "crystalline."

Complainant thereupon amended said claim 1 by inserting after the word "carbide" the words, "existing as masses of aggregated crystals," and added a second claim, reading identically with the claim in suit. Being then advised by the examiner that there was no patentable difference between the two, and that he must elect which one he would rely upon, he selected claim 2, the present only claim of the patent in suit, whereby the existence of masses of aggregated crystals in the product claimed became the essential distinguishing feature of the patent in suit. No form of crystalline calcium carbide which does not exist as masses of aggregate crystals would come within the claim.

Whether or not crystalline calcium carbide as a new product, hav-

ing a bluish iridescence, substantially as described in the specification, is the product of the patent in suit is beside the mark. Undoubtedly, the further language of the claim, viz., "existing as masses of aggregated crystals, substantially as described," was added in order to satisfy the examiner and avoid the prior art, which the patent says was limited to an amorphous product. If it does avoid the prior art, it must appear that it contains or exists as masses of aggregated crystals. It must, defendant insists, be more than mere crystalline calcium carbide. That product, it is contended, complainant·has abandoned to the public. It can hardly be urged, so far as appears from the present record, that every crystalline calcium carbide of necessity exists as masses of aggregated crystals. The objection of the examiner did not consist in mere matter of description, but went to the substance itself. According to Williams' Elements of Crystallography, p. 16:

"The union of two or more crystal individuals produces a crystal aggregate, while a mass of crystal grains, devoid of their characteristic forms and closely packed together, may be termed a 'crystalline aggregate.'"

In the American Carbide Co. Case, supra, the court says:

"It is said that the phrase 'masses of aggregated crystals' has a specific and limited meaning, i. e., it means 'crystal aggregate,' which is a union of two or more fully developed crystals, as distinguished from 'crystalline aggregate,' which is a mass of crystal grains devoid of their characteristic forms and closely packed together."

This distinction the court deemed unwarranted in that case, especially in view of the specification, and held that the claim in suit "covers crystalline carbide when the crystals are aggregated in masses, whether such crystals be perfect or imperfect," and adds, "and, as it is admitted that there are crystals in the defendant's carbide, and as those crystals are so aggregated, we think that the product of the defendant infringes," and thereupon reversed the Circuit Court.

As above said, defendant herein denies that its product exists as a mass of aggregated crystals, whether the crystals be described as perfect or imperfect, and contends that there are no crystals in its carbide; and that "what are termed crystalline grains or crystalline cleavage faces are not crystals, and do not respond to the definition of crystals, whether perfect or imperfect." Thus it will be seen that the issues here involved differ from that stated by the court in the American Carbide Company's Case, supra. Undoubtedly, the term "masses of aggregated crystals," as applied to calcium carbide, would include imperfect crystals. But does it cover the mass of crystal grains, devoid of their characteristic forms and closely packed together, termed a crystalline aggregate? Is the term "mass of crystal grains" as above qualified comprehended within the language, "masses of aggregated crystals?"

[2] Defendant's expert, Walker, testifies he has produced masses of crystals of calcium carbide as distinguished from a crystalline mass; that these have no practical or commercial value, and that their formation depends upon slow cooling of large masses. The specification was not changed at the time the original claims were amended.

It calls for a new product, existing in the form of crystalline calcium carbide. "Calcium carbide," says Willson (specification, line 11, p. 1) "has existed in an amorphous condition, due either to the method of its preparation or to the impurities contained in it." By "amorphous" he meant without definite form, or uncrystallized, having mainly in mind the calcium carbide disclosed by Woehler in Liebig's Annalen der Chemie und Pharmacie, vol. 124, p. 220, published in 1862. Several expert chemists, testifying for defendant, depose that they have made calcium carbide according to Woehler's formula, and that the result has been a hard compact crystalline mass. If this be so, it was not amorphous. Woehler's calcium carbide was, so far as appears here, the result of a laboratory experiment, and was never brought out as an article of commerce. At the time it was announced, there was no adequate method of producing it so as to make it such, quantity, quality, and cost considered. Only by the use of electricity has it become at all available. Indeed, this ally was not enlisted in its production until some considerable time after the methods employed in its manufacture had become generally known in the reduction of refractory compounds. Calcium carbide is the basis of acetylene gas, an article which is largely in demand for purposes of illumination. It is a matter of common knowledge that this industry has developed greatly within the last 20 years. It undoubtedly gave an impetus to the appropriation of the Woehler disclosure. Owing to the use of electricity cheaply attained, it became possible to make it purer and in great quantities. As said by the court in the American Calcium Carbide Company Case:

"A new article of commerce is not necessarily a new article patentable as such. But patentable novelty in a case like the present may be founded upon superior efficiency; upon superior durability, including the ability to retain a permanent form when exposed to the atmosphere; upon a lesser tendency to breakage and loss; upon purity; and, in connection with other things, upon comparative cheapness. So, as supplementing other considerations, commercial success may properly be compared with mere laboratory experiments."

In Kuehmsted v. Farbenfabriken of Eberfeld Company, 179 Fed. 701, 103 C. C. A. 243, it is said:

"And it makes no difference, so far as patentability is concerned, that the medicine thus produced is lifted out of a mass that contained chemically the compound; for, though the difference between Hoffman & Kraut be one of purification only, strictly marking the line, however, where one is therapeutically unavailable, patentability would follow. In the one case the mass is made to yield something to the useful arts; in the other case what is yielded is chiefly interesting as a fact in chemical learning."

Therefore, unless complainant's grantor surrendered crystalline calcium carbide to the public, the injunction should issue in limine, since there is no doubt of defendant's infringement of that article. As above noted, there is a wide and irreconcilable divergence between the witnesses as to what complainant surrendered, if anything. The New York court granted an injunction against the manufacture of crystalline calcium carbide. In the judgment of the court upon the present record the complainant's product is nothing more than crys-

talline calcium carbide. If the course pursued by it worked a fraud upon the examiner, that must be shown beyond doubt. Had Willson stood his ground and abided by his first claim, there is little doubt, as the matter now stands, he would have been entitled to its allowance. Was he justified in putting some disguises upon it in order to overcome the Patent Office objections? I think it quite probable as the evidence stands that the mass of crystal grains, devoid of their characteristic forms and closely packed together, which constitute a crystalline aggregate, would come within the language of the claim. This opinion may be changed on final hearing. I feel, however, that I shall be doing substantial justice in so holding now. The preliminary injunction may go as to patent No. 541,138. As to the other patent (No. 708,921), it never having been adjudicated, no relief is granted. In view, however, of the condition of the record and the delay of complainant in commencing suit, as well as in consideration of the damage which may result to defendant should the court not sustain the patent or infringement thereof on final hearing, the injunctional order will stand suspended upon the deposit by the defendant with the clerk of this court as tendered at the hearing of the sum of $50,000 until the final disposition of the case, or until the further order of the court.