ASBESTOS SHINGLE, SLATE & SHEATHING CO. et al. v. H. W. JOHNS-MANVILLE CO.

(Circuit Court, S. D. New York. December 3, 1910.)

1. PATENTS (§ 65*)—ANTICIPATION—PRIOR PATENTS.

A patent must do more than to make untested suggestions or pregnant surmises to constitute an anticipation of a later patent.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 80; Dec. Dig. § 65.*]

2. PATENTS (§ 65*)—ANTICIPATION—PRIOR PATENT.

Where the disclosures of a process patent in regard to the machines and method employed are so uncertain that they can only be spelled

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

out tentatively, such patent is not an anticipation of a later one for a definitely described process.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 80; Dec. Dig. § 65.*]

3. PATENTS (§ 144*)—REISSUES—CONCLUSIVENESS OF DECISION OF PATENT OFFICE.

The ruling of the Patent Office on an application for reissue that the failure of the patentee to include certain features of his invention was due to accident, inadvertence, or mistake cannot be reviewed by the courts on the facts.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 215–217; Dec. Dig. § 144.*

Conclusiveness and effect of decisions of Patent Office in proceedings on application, see note to Novelty Glass Mfg. Co. v. Brookfield, 95 C. C. A. 530.]

4. PATENTS (§ 141*)—REISSUES—IDENTITY OF INVENTION—PROCESS AND PRODUCT.

A patent for the product of a process is for the same invention as the process itself, and a reissue of a process patent, containing a new claim for the product, is not a departure from the original invention.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 206–213; Dec. Dig. § 141.*]

5. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—PROCESS OF MAKING ARTIFICIAL STONE PLATES.

The Hatschek reissue patent, No. 12,594 (original No. 769,078), for a process of making artificial stone plates and the product of such process, which consists of mixing together, in a great bulk of water, hydraulic cement and asbestos or other fibrous material, agitating the same for some time until the cement takes on a peculiar condition, termed in the patent "colloidal," then pouring the mixture into the receiving vat of a cardboard machine, by means of which plates of the required thickness are formed which are then pressed and cured, was not anticipated, discloses the process with sufficient completeness, and the reissue is valid. Also, *held* infringed by the process practiced and the product made by the use of the machine of the Sillman patent, No. 829,770.

In Equity. Suit by the Asbestos Shingle, Slate & Sheathing Company and Ludwig Hatschek against the H. W. Johns-Manville Company. On final hearing. Decree for complainants.

Clifton V. Edwards, for complainants.
A. Parker-Smith, for defendant.

HAND, District Judge. This case comes up on final hearing upon the ordinary bill in equity for infringement of the complainant's reissue patent No. 12,594, covering a certain invention, process, and product, relating to artificial stone plates. The process consists of mixing together, in a great bulk of water, hydraulic cement and asbestos fiber, or other fibrous material. By sufficient agitation continued for some time the cement takes on a peculiar condition termed in the patent "colloidal," about the exact molecular structure of which the highest scientific authorities differ. It is conceded that, whatever be the correct analysis of the change physically speaking (there being thought to be no atomic change), its gross aspects include a swelling in bulk to a noticeable extent. It is further agreed that the "setting"

of the cement is markedly delayed, and, indeed, if the agitation in a great bulk of water be continued for three hours, the defendant's expert, Norton, believes the result will be wholly to destroy its "setting" power.

After the asbestos fiber and cement have been thoroughly mixed in a great bulk of water, the mixture is poured into the receiving vat of a cardboard machine. Within this vat is a wheel upon the circumference of which is a fine wire gauze. The vat is drained from the inside of the wheel in such way that the thin paste to escape must pass through the wire mesh. The cylinder is revolved, and to the outer side of it, as it rises, clings the solid portion of the paste. At the top of its revolution, the cylinder comes in contact with a felt belting which takes off the paste and carries it forward, drying it on the way, until it comes in contact with a "coucher" roll, having itself a wire gauze upon the circumference, which takes the paste from the felt belting onto itself. Each revolution of the coucher roll adds a layer of paste to its periphery and so builds up a plate of increasing thickness. When the proper thickness is obtained, the paste is slit longitudinally on the coucher roll, taken off, pressed under high pressures, and removed to suitable rooms, where it is cured. The process of curing practiced by the defendant extends over considerable time, and its perfection has been the subject of some experiment, the details of which will appear later, but which do not appear in the patent in suit.

The first patent was taken out on August 30, 1904, and a reissue on January 15, 1907. The reissue was applied for on August 20, 1906 —therefore within two years of the original patent. The specifications of the reissue are substantially the same as those of the original patent, except that on pages 2 and 3 of the reissue there are added, page 2, lines 30–130, and page 3, lines 1–15. These do not add to the description of the process, but do add statements about the character of the product. The original claims were two in number, corresponding verbatim to claims 2 and 3 of the reissue. The reissue claims 4 and 5 are substantially similar to claims 2 and 3. Claims 6 and 7 are for the product of the invention, and claim 1 is of a different and wider character, which it will not be necessary to consider for the determination of this controversy.

The proportions of the mixture are nowhere stated definitely. On page 1, lines 78–82, occur the words:

"In such a way it is possible to produce an article which contains 80 to 90 per cent. of cement to 20 to 30 per cent. of fibrous material."

And in the example given of the mixture specific proportions are used in the relation of five parts by weight of cement to one part of asbestos to the dry mixture, and there is added five or six times in amount of water. In speaking of the product on page 2, lines 70–74, the patentee, in speaking of the difference of his own product from that of others, says that his own product is different from that of others "because of its composition, containing within the limits heretofore stated, say 85 per cent. of hydraulic cement and 15 per cent. of asbestos."

The defendant after January 15, 1907, and for a period which does not definitely appear, used the process of manufacture exactly as disclosed, except that, in place of the ordinary cardboard machine, mentioned in the patent, it used a machine patented under the Sillman patent, No. 829,770. In this machine the mixture was made to flow through a trough and under a roller directly upon the felt without the interposition of the rolling cylinder of the ordinary cardboard machine. The only difference which this produced in the substance was as follows: In the patentee's process, when the paste first flows upon the wire gauze of the revolving wheel, the cement, being more finely divided than the fiber, flows through with the water until the agglomeration of asbestos fibers upon the gauze is fine enough to hold the cement, the result being that each layer which is taken off on the felt is not of strictly homogeneous character, one side of it having more fibers and less cement than the other. This fact is mentioned in the reissue patent, page 2, lines 80–105. When made by the Sillman machine, the layers are necessarily homogeneous, as they have not been strained through any gauze. The defendant, by virtue of this difference, makes some question of infringement; but I do not think that it is of any importance. Although the Sillman machine is not strictly a cardboard machine and may well be an improvement upon the applicant's method, it is to my mind very clearly the equivalent of that method, and produces substantially the same product in precisely the same way. The only difference is in the way in which the paste is carried to the belt. That is a step in the process which has no pregnant significance under the patent itself. The process continues in precisely the same way, and the product is built up in layers just as in the patent in suit. If the patent required limitation through the prior art, the question might be more serious; but, as I shall show, I cannot find anything in the art which requires such limitation.

The third claim is as follows:

"The herein-described process of producing artificial stone plates, consisting of first mixing asbestos fibers and hydraulic cement in the presence of a great bulk of water, then forming therefrom a series of thin layers of the mixed cement and asbestos superposed on each other until the required thickness is secured, then pressing the same and allowing the material to set or harden, substantially as set forth."

I have no trouble in finding that the Sillman machine infringes this claim.

The seventh claim is as follows:

"A product of the invention hereinbefore set forth, being a composition containing hydraulic cement which has been rendered colloidal."

I do not interpret this claim as meaning any product containing hydraulic cement which has been rendered colloidal, for the claim is clearly limited to the product of the invention thereinbefore set forth. Indeed, the last words might have been omitted from the claim without injuring its effectiveness. Being a claim added on reissue, it would be valid only in case it was for a product of the process previously patented, and I so construe it; ut res magis valeat quam pereat. As such it covers the product of the Sillman machine, because under this

claim no question arises in regard to the layer like structure of the product, except that it is, of course, necessary that it should be made by a process of deposit in layers. I need not therefore, take up the question raised by the expert Norton (Defendant's Record, folios 284, 285), whether the patent includes the product of Mr. Norton's own company, which is made up in quite a different way. On the evidence, this is necessarily a moot question, and the defendant cannot properly ask for its determination. Therefore I decline to pass upon it. Should the complainant misuse this decree, that would be a subject for independent consideration, if it were brought to the court; but such a possibility cannot justify an expression of opinion upon matters which are not properly before the court.

The question then turns upon the validity of the patent, which is attacked upon three grounds: First, its lack of novelty; second, the incompleteness of the disclosures; third, the invalidity of the reissue. These questions I shall take up in this order.

The use in paper making of a binder in the form of plaster was very old in the art. There is an English patent to Hooper, in the year 1787 (No. 1,622), which shows how plaster may be added to the improvement of paper. The use also of asbestos in paper making was old, as appears from the British patent to Maniere (No. 1,413), in the year 1853, and in which the patentee recommends the substitution of asbestos when reduced to pulp for other fibrous material. Moreover, the combination was not new of asbestos with an inert filler, as infusorial earth, even in combination with a binder and used in the usual paper machine, as appears from American patent to Brown, in 1884, No. 296,722. In this patent, however, hydraulic cement was not a factor, although Brown suggests the possibility of the use of lime or other cementitious material. Prof. Chandler, a high authority, says flat-footedly that infusorial earth is an inert substance and has itself no binding power (Complainant's Record, folio 198). Norton speaks of infusorial earth in combination with lime (Defendant's Record, folio 215), as though it would set somewhat; yet there is no question but that it is a very different combination from the hydraulic cement. The substitution of cement for this combination may have been an obvious step, but no one took it before Hatschek. Besides, the mere substitution of cement was by no means enough without an agitation in a large bulk of water, of which Brown had not the slightest idea. An examination of the product itself shows how absolutely different Brown's patent was from the patent in suit.

Imachenetzky also disclosed a way of making asbestos cardboard upon a cardboard machine, although this was not new. His invention (Nos. 629,567 and 631,719) consisted in mixing silica with asbestos and then by suitable additions making colloidal the form of the silica. This he did in various ways, as appears by his American patents; but nowhere does he suggest the use or the possibility of the use of hydraulic cement. His machine (British patent, No. 18,747, 1899; French patent No. 293,247, 1899; and American patent No. 668,562, 1901) was a very ingenious way of effecting a double impregnation of the silica as the plate was being made upon the coucher

roll; but nowhere is the possibility of using cement even suggested. As in the case of Brown, the character of the result shows how absolutely different were the two processes. The usual argument as to their "obviousness" is met by the usual answer:

"If it was obvious, why did no one else think of it after the time came when it was so profitable?"

The reason may be, as Hatschek says, that nobody supposed hydraulic cement would tolerate so long a process and still set at the end of it. However, no court is required to speculate as to the reasons. It is enough that no one did it, though there was for some years prior to Hatschek's discovery a great field of use for cement. Another reason may be that all prior users of the cardboard machine approached the matter from the aspect of asbestos cardboard; the experiments being in the filler and binder. Hatschek was trying to make slate and stone, not paper; and stone he succeeded in making. It is easy now to show that a paper maker could have made the obvious substitution, but that is because of Hatschek's original inventive conception.

In 1888, Lee, an Englishman, obtained a patent (British patent No. 3,708 of that year) for a mixture of asbestos with cement while in a liquid condition, out of which he proposed to make "slabs, blocks, parts, and structures of this material, the asbestos fiber permitting me to make, for example, slabs and paneling much thinner and stronger than would be the case if the cement or composition were used without the said ingredient of asbestos fiber." There is no indication, however, of the manufacture of these on a cardboard machine or of any other way than by treating them as a thick plaster and molding them accordingly. Mr. Norton is satisfied that Lee must have used a cardboard machine. Perhaps he did; but he said nothing about it, which is the point. It is surely somewhat ingenuous to ask a court to hold the art already enriched by what an inventer, like Mr. Norton, after "much thought" and "much time in experimenting upon it," has now discovered must have been the undisclosed method. So to hold would be to fail adequately to recognize the skill and ingenuity of the inference, which is certainly quite beyond the powers of the usual skilled artisan.

In 1895 another Englishman, Hitchins (British patent No. 1,256 of that year), also invented a machine which would deliver a composition of fiber and cement from a mixing vat in a continuous layer so that it could be chopped off into convenient sizes. The delivery was made from the vat upon a table, where the mass was at once pressed between a series of rollers over the surface of which ran felts, between which the plastic mass itself moved. There was no suggestion, however, of making up the paste in layers, nor was there any similarity between the machine used and a cardboard machine. This patent defendant cites to show that the Sillman machine does not infringe; but the citation is irrelevant, for, even though it showed that Hitchins anticipated Sillman in making a direct delivery from the vat upon the felt, it was in no sense an anticipation of the process of building up a cement slab in layers upon a coucher roll.

184 F.—40

This disposes of the only patents cited in the prior art except two, and these are much the most important. The first is the British patent to Sachs, No. 4,787 of 1880; and the second is a series of patents to Simmons & Bocks in Germany, France, and England. Sachs' patent was primarily for the purpose of treating slack-wool, or slag, a by-product of glass manufacture. The principal purpose of his patent was to show how the slag could be purified and its lighter fibers separated from its heavier and shorter fibers through a machine which he discloses. In stating the uses for his purified fiber, he uses the following language:

"The mass thus obtained may be used for the manufacture of papier-maché, or such like materials used in the arts for the manufacture of roofing felt, of packings for engines, apparatus, and tubing, for the manufacture of card and pasteboards and papers with or without the addition of other materials which may serve as binding materials, such, for example, as glue, starch, alumina-resinate, gypsum, soluble silicate of soda, cements, and the like."

He also speaks of using the material as combined with asbestos.

The defendant's theory is that Sachs must have meant, by cements, hydraulic cements; that by the manufacture of cardboards he must have meant the use of the usual machines; and that by the suggestion which he made of the uses of his substance he therefore disclosed completely all that Hatschek did. That is not enough; the art must be enriched by more than fruitful intimations, untested suggestions, or pregnant surmise before the subsequent comer who has elaborated and proved the invention may be deprived of his right. Happy intuition is no doubt necessary to an inventor, but it is not the whole of his endowment; to benefit his art he must show to other men by more than mere sketchy suggestion how they may practice what he has discovered. Perhaps Sachs' patent might have served as a good starting point for real addition to the art, but as it stood it was no more than that. Cf. American Graphophone Co. v. Leeds & Catlin Co., 170 Fed. 327, 331, 95 C. C. A. 511, 515, in which the court says:

"The naked assertion that a certain result has been accomplished without stating how, without describing the means which produce the result, is insufficient as an anticipation."

Similar cases are Loew Filter Co. v. German-American Filter Co., 164 Fed. 855, 90 C. C. A. 637, and Naylor v. Alsop Process Co., 168 Fed. 911, 94 C. C. A. 315.

The great reliance of the defendant is upon the patents to Simmons & Bocks. The first of these patents appeared in Germany on April 20, 1900. This patent describes a process of making fireproof and waterproof sheets. A thickish mass is to be made by a mixture of asbestos, zinc oxide, and cement with glue water, which is to be spread out on both sides on some kind of mesh, by means of a carding or other suitable machine. When both sides have so been coated, the sheets are to be pressed in rollers, and the compressed sheets, when dried and impregnated with aluminum phosphate, are ready for use. The pulp can best be fed to the press by endless conveyers, and indeed the process could have been well carried out on the Hitchins machine above mentioned.

There is certainly in this patent absolutely no suggestion of the patent in suit, and no indication that the process could have been used upon a cardboard machine. It is undoubtedly true that the words "carding or other suitable machine" are inapt, and somewhat confusing; but, whatever they meant, they did not mean a cardboard machine. It would be an absurd use of words to speak of the cardboard machine as spreading out this thickish mass on both sides of the mesh.

On the 8th of September, 1899, Simmons & Bocks filed provisional specifications for their patent in England and on the 22d of November, 1899, they filed similar specifications in France, which was granted on May 9, 1900. These two patents are practically translations one of the other. Although not absolutely literal, there can be no question to my mind that the process described by the patentees in each was intended to be absolutely the same, and the parallelism between them is almost absolute. The English patent is more detailed than the German patent already cited, but it starts off in somewhat the same way. The·process is to make slabs and bricks to resist fire and water, and the materials to be used are asbestos treated in a rag engine, and cement. I cannot doubt that the rag engine is· used simply to treat the asbestos, and that the cement is not intended to be mixed in with it till after it is treated. Mr. Little, one of the defendant's experts, speaks of this position as follows:

"To any one familiar with paper making, such an assumption is simply too foolish for consideration." Defendant's Record, folio 408.

This somewhat categorical opinion begs the question by assuming that Simmons & Bocks were in fact engaged in a paper-making process, which I think it appears quite clearly that they were not. The position of the phrase "treated in a rag engine" in all three patents is the same, and in the French patent the gender of the word "asbestos" (l'amiante) prevents any construction other than the one which I have adopted. The remainder of the process shows quite clearly that the purpose of treating the asbestos is to reduce it to shredded form. Finally, in the first example the asbestos is spoken of as "digested," and in the French patent still more definitely as "passée à la pile à cylindres." I think the intent is clear to indicate that the asbestos before being used must be thoroughly disintegrated, and that that is all the patentees mean.

The patent then prescribes that the asbestos and cement shall be thoroughly mixed with suitable adhesives, and with the addition of fillers and fire-resisting ingredients, and then made into a thick paste, after which it is to be pressed in suitable molds; a mesh being inserted if desired. Then follows the description of the method of impregnating the product to make it resist water. This is the general description of the invention and must be supposed to cover all of the four examples afterwards given. These four examples of the process are shown in detail.

In the first the "digested" asbestos and the cement are mixed with zinc oxide and with weak glue water to a paste. This is coated upon both sides of a mesh, which process is effected preferably "by means of a suitable scraping or spreading device." The plates so made are

then pressed and passed through another process. This clearly has no reference to the patent in suit, nor is it claimed to have; but it is important to observe that the "scraping or spreading device" is the same as the phrase "un dispositif de cardage," in the French patent, which means a carding machine and shows beyond peradventure that the word "cardage," used in the French and German patents, is used advisedly, does not mean a cardboard machine, and does mean a scraping or spreading device.

The second example provides that asbestos, cement, zinc oxide, and sulphate of alumina are to be mixed to a thin paste with water. A wire mesh is coated with this paste "and the plate made by spreading in the same way as pasteboard." This is then pressed, and "the pressure is repeated at intervals first in layers, when the separate coatings are applied."

In the French patent the important phrase is as follows:

"This paste is then applied (appliquer) to a metallic mesh and the plate is made by drawing off (puisage) like cardboard; then it is pressed, etc. The pressing takes place at several intervals first by layers as the layers are applied."

Now it is impossible upon an automatic cardboard machine to press the plates till they are all done, because the plate must be cut longitudinally and taken off the machine. Just what is the process here described is not perfectly clear; but the most reasonable interpretation of the language in both patents is that the thin paste is still thick enough to be spread over the mesh even though one may speak of "drawing it off." The word "puisage" literally means drawing a liquid from one receptacle by means of another. If this be the correct interpretation of this example, it does not suggest the patent in suit, and the words "in the same way as pasteboard" only mean "built up in layers like pasteboard," which is what I think they do.

In the third example of the process a somewhat different mixture is prescribed. The important words are the following:

"In order to avoid fracture, the plates are made in a spreading or pasteboard machine according to the method described in the first example."

The spreading machine was in fact referred to in the first example, but a cardboard machine was not there referred to, and it is unquestionably the fact that the reference is puzzling. In the French patent the phrase is "dans la machine à carton," which, although it means a pasteboard machine, likewise seems to refer unmistakably to "un dispositif de cardage," since that is the only machine mentioned in the first example. The English patent seems to try to bridge the difficulty by using both the word "spreading" and the word "pasteboard," which is even more confusing. Considering the whole disclosure, it would seem most reasonable to suppose that "machine à carton," which is the same as "dispositif à cardage," means a spreading machine which will build up the plates "in the same way as pasteboard"; that is, in layers, "couches." It is true that there is some violence done to the language of the French patent in so construing "machine à carton"; but it is less than the violence to German, French, and English patents in

supposing that "dispositif de cardage" means the usual cardboard machine, which certainly could not work with a thick paste.

It is perhaps possible, though it is somewhat far-fetched, to suppose that the patent contemplated the use of a hand-dipping cardboard machine; the paste to be conglomerated with the mesh integrally. If this were so, I should still not regard the patent as an anticipation. It might be that to change from hand to automatic cardboard machine would not be invention, but that was not the only necessary change upon this hypothesis. The process remained one in which the mesh was imbedded in the paste, and the mesh is essential in all those processes which prescribe a "machine à carton," or a "dispositif de cardage," and there is no indication anywhere that the patentees supposed it possible to disentangle the mesh from the cement when such a machine was used. The very purpose of the patent in suit was, however, to make a plate upon, and not around, the mesh of the coucher roll. The suggestion is mistaken which supposes that the mesh is to be run in upon the cardboard machine, even assuming that this is possible. Except in the second example, it is quite clear that thick paste was to be used, which would not have worked on a cardboard machine. In the second example, as I have already said, there could be no "pressure repeated at intervals, first in layers when the separate coatings are applied," because the plate cannot be taken off the coucher roll without slitting it and could not then be put back; at least, it is absurd to suppose that anything of the kind was meant.

Even if this analysis is not certain, the very difficulty of determining what the patent does mean is enough to prevent its being an anticipation. Whatever the disclosures in regard to machines and methods, they can only be spelled out tentatively. It is clear enough that the patentees thought only of the mixture and expected the paste to be applied in any convenient way in layers. The claims do not contain any reference to the kind of machine or the method of making up the plates. It would take much less uncertainty than appears to hold this to be an anticipation of Hatschek.

In considering this patent, I have assumed—what is by no means satisfactorily shown—that the mixture used by Simmons & Bocks was essentially the same as cement and asbestos. Little says that the oxide of zinc used was for color; that the sulphate of alumina "tends to harden the finished sheet." Norton says that the zinc oxide is put in to make the plate waterproof (Defendant's Record, folio 533); that the water glass and sulphate of alumina serve to furnish an active cementing substance; "but that the real fundamental disclosure was the combination of asbestos and cement" (Defendant's Record, folio 539). Prof. Chandler, on the other hand, regards these additions, in the light of the previous art, as having an important function as hardening agents (Complainant's Record, folios 136–138). They had been used by earlier makers of artificial stone, and the more reasonable interpretation is to assume that Simmons & Bocks added them to reinforce the action of the cement. At least it would be unwarrantable to say that they were put there merely as inert substances, or for other purposes, unless the purposes were disclosed. If the defendant takes that

position, it is incumbent on him to show that it is true, and that he has not done. At best, the disclosure is ambiguous, and requires some new invention, at least some ingenuity, to piece out what was described.

There is still a third reason why Simmons & Bocks did not anticipate the patent. The cement was not stirred or beaten in a large bulk of water. Little says the contrary, but he was misled by the phrase "travaillée au .cylindre à broyer," and "passée à la pile à cylindres." Without such a process, the cement does not assume "colloidal" form and cannot be treated successfully by the Hatschek patent. It is not a case of using a · process without knowing what actually occurred. There is no indication that the process was used. Therefore this patent is not in any respect a valid anticipation.

Hatschek's discovery remains, therefore, quite untouched by any prior patent. It is true that scientists had for some time known that cement, when stirred in a large bulk of water, would take on this socalled colloidal form; that is, would swell in size, and become starchlike or stiff, after the manner of many colloids. It is of absolutely no consequence whether in fact the substance in that form was a true colloid or not. Upon the scientific controversy Hatschek does not commit himself at all:

· "The hydraulic cement of the mixture seems to swell up, taking the appearance· of a more or less colloidal, starch, or pastelike mass." (Page 1, lines 52–55).

This is surely not the way to state a scientific dogma. All that concerned him was that he should be able to delay the "set" of the cement while the process lasted, and that he did. It makes not the slightest difference that he did not discover this property of cement, for he was the first to use it fruitfully and practically upon a cardboard machine. Nor is it of any consequence either if Norton mixes his cement to a thick paste and presses it at once. That may be a better process, and, if it does not infringe, Norton is of course free to use it; but it does not touch this controversy. What is revelant here is that there is no suggestion that any one before Hatschek used the cardboard machine to make such plates. Whether good or useless, the process should be his.

The next objection is as to the validity of the disclosures. The patent discloses the necessity of high pressure (page 1, lines 28–30). "The cardboard like plates obtained are then pressed under high pressure" (page 2, lines 13–15). · The plate is "pressed to the desired shape, whereupon it is caused to set in suitable rooms." Each of claims 2, 3, 4, and 5 contains the following words: "Then pressing the same, and allowing the material to set or harden." The defendant relies upon the cross-examination of Jewett, a hostile witness, and upon some conclusions of Norton, to show that these disclosures are not enough to guide the maker. The trouble with Jewett's testimony is that he did not originally follow the patent when he got the bad results. .At first he did not press the plates at all, as he was directed, and put them in artificially heated rooms, each plate separated from the other with dry currents of air flowing between them. When he began

to apply high pressures, and to set them close together in normal atmospheric temperatures, they improved and became merchantable. It may be that it was natural for him at first to follow the analogy of asbestos millboard; but the fact remains that he did not follow the patent, and that if he had he might have saved his six months of experiment. All that is necessary is to press the plates and stack them in the open air. Sometimes they are wet down, sometimes not. There is no evidence of any virtue in the open air beyond the usual temperature "of suitable rooms." At most one can only say that the higher pressures of 20 to 40 tons may have improved the product, though it does not even appear then what were the pressures common in the prior art, except as Jewett pressed asbestos millboard. The whole contention seems to me elaborately fictitious and artificial.

The last question is that of the reissue. The grounds for reissue were within the discretion of the commissioner. His ruling that Hatschek's failure to include his product was due to accident, inadvertence, or mistake is not reviewable here on the facts. Seymour v. Osborne, 11 Wall. 516, 20 L. Ed. 33; Russell v. Dodge, 93 U. S. 460, 23 L. Ed. 973; Topliff v. Topliff, 145 U. S. 156, 12 Sup. Ct. 825, 36 L. Ed. 658. The only question which can arise is as to the identity of the two inventions. Claim 7 is limited to the product of precisely the process described. That product is the same invention as the process itself. James v. Campbell, 104 U. S. 356, 26 L. Ed. 786; Powder Co. v. Powder Works, 98 U. S. 136, 25 L. Ed. 77. It is quite true that in both these cases the rule is laid down obiter, but it is quite deliberate, citing a decision of Mr. Justice Grier in Goodyear v. Central Ry. Co. of N. J., 2 Wall. Jr., 356, Fed. Cas. No. 5,563, and I should feel bound by it as authority even if it did not seem true in principle. In other countries, it is even unnecessary to claim the product separately, nor would it have been less desirable had our own law developed in the same way.

It will be unnecessary to consider the validity of claim 6 under the estoppels of the original file wrapper, because this case is disposed of if claims 3 and 7 are upheld. I think them both valid and infringed by the Sillman process and product.

Let the usual interlocutory decree pass upon these claims, with costs.