ASBESTOS SHINGLE, SLATE & SHEATHING CO. et al. v. H. W. JOHNS-MANVILLE CO.

(Circuit Court, S. D. New York. January 30, 1911.)

1. PATENTS (§ 328*) — VALIDITY — PROCESS OF MAKING ARTIFICIAL STONE PLATES.

 The Hatschek reissue patent, No. 12,594 (original No. 769,078) for a process of making artificial stone plates and the product of such process, claim 6, which is for a product not stated to be produced by such process, and which must be presumed not to be since such product is expressly

covered by claim 7, is void because it does not show the method of making the product, and also because a claim for the same thing in the original application was rejected with the patentee's assent. Claim 1, which is for a process of making hydraulic cement colloidal, is also void for lack of novelty.

2. WORDS AND PHRASES—"GROUT."

"Grout" is a thin watery concrete in which the proportion or bulk of water is large.

In Equity. Suit by the Asbestos Shingle, Slate & Sheathing Company and Ludwig Hatschek against the H. W. Johns-Manville Company. Decree for complainants in part.

See, also, 184 Fed. 620; 189 Fed. 611.

Clifton V. Edwards, for complainants.
A. Parker-Smith, for defendant.

HAND, District Judge. The complainant insists upon a decision upon claims 1 and 6 after having an opportunity to discontinue as to them, and therefore it becomes my duty to decide upon them.

Claim 6 is as follows:

"An artificial-stone product consisting of a major proportion of hydraulic cement and a minor proportion of fibrous material, the product being in layers and elastic, non-brittle and penetrable to nails—that is, capable of being nailed similar to paper building-board or wood—incombustible and water and frost resistant, of hardness, strength, and durability, and having a certain quality of toughness which enables it to resist strains and shocks which would shatter ordinary brittle material, such as slate, and the product being, finally, easily cut and sawed into shape and capable of being presented thin enough to serve as a substitute for wooden shingle and slate tile, and substantially as described."

Unless this product is the product of the Hatschek patent, the specifications do not show how to make it, which of course is necessary. It must be made in layers, and it is not apparent how such a watery product can be made in layers, except upon a cardboard machine. On the other hand, if it is construed merely as the product of the process described it is precisely the same as claim 7, and under well-established rules two claims must be read differently when they occur in the same patent, else one is redundant. Therefore, it must be construed as meaning a product of some other process than that shown, and as such it is bad.

Again, if claim 6 be for some other product than that of the process, as indeed it must be, and if it is thought to be specified, still it is invalid, because precisely the same claim was rejected in the original file wrapper without complaint. That claim was as follows:

"As a new article of manufacture, an artificial stone plate, consisting of asbestos fibres and hydraulic cement, the cement greatly in excess of the fibres, said plate being composed of a stratified homogeneous mass of the aforesaid materials, substantially as described."

Having assented to that rejection the complainant may not now assert it. Corbin Cabinet Lock Co. v. Eagle Lock Co., 150 U. S. 38, 14 Sup. Ct. 28, 37 L. Ed. 989.

Claim 1 is as follows:

"The process of rendering hydraulic cement colloidal, which consists in working the same with a large bulk of water—that is to say, with sufficient water to allow the particles of cement to be kept in motion and thus segregated—whereby the setting or hardening power of the cement is not destroyed, and, in the presence of other material, as well-divided asbestos it is intimately associated with the latter, so that even if the weight of the cement be greater than that of the material with which it is mixed, no separation takes place, substantially as set forth."

The claim here is for the process of working cement with a large bulk of water so that its setting power is not affected, and it may be mixed intimately with other materials. The so-called "colloidal" properties of cement were well-known long before Hatschek put them in his patent and were fully described. Yet this is absolutely his claim. It is true that in the claim he mentions a use to which it may be put—i.e., that of making an intimate mixture with other materials—but that is only one use of the process, and the process itself is claimed in its bare entirety, without limitation to the specific use of the process to insure an "intimate association." However, even if the claim be held to include the mixing of colloidal cement with other materials, it is still invalid. Such mixtures were known for years under the name of "grout," which is a thin watery concrete in which the proportion or "bulk" of water is large. Just how large the proportion must be the complainants' witness Dyrenforth would not say, except that particles of cement must be kept separated. It is of course immaterial that the scientific results of the process were originally unknown, for the process took place, whatever it was. Moreover, grouts have been made since this property of cement was known, and all of them were within the terms of this claim. The only novelty of Hatschek's invention consisted in his use of the colloidal character of cement to make his plates upon a cardboard machine, and that he has been accorded in the opinion already handed down.

I am, in conclusion, also satisfied that the claim cannot be saved, as the complainant suggests, by incorporating the whole process, machine and all, and I must hold it invalid.

The defendant's brief calls attention to some supposed mistakes in the former opinion which require some notice. It is of no consequence that the English patent to Simmons & Bocks was not a good reference, because its use is only to show the meaning of the French patent. It was apparently the original of the French patent, and, as such, it is an authoritative and peculiarly useful indication of the meaning of the inventors in the French patent, and much the best source of interpretation of their meaning when the French is ambiguous. Why the defendant calls it "an imperfect translation" it is impossible to see. There is no ground to say that the phrase "de la maniere decrite au chapitre 1 ou de toute autre maniere appropriee," creates two other alternatives to "la machine a carton." The assumption is that "la machine a carton" is the equivalent of the supposed method of the second example, yet no "machine a carton" is there mentioned, nor can it be supposed to have existed as I have shown in the opinion. Besides, why was the order of the examples inverted? However, the

English translation leaves no room for doubt that the natural meaning was that which was intended, and that this thick paste could be spread as in the first example or in any other way. If this conclusion be wrong, it is not through inadvertence.

My use of the term "coucher-roll" in place of the "press-roll H" accounts for the natural failure of the defendant to understand the argument in the opinion based upon the impossibility of using a cardboard machine for the Simmons & Bocks process. This misunderstanding was increased by the fact that I spoke of the "mesh of the coucher-roll," when it has no mesh. If, however, the word "press-roll" be substituted, the reasoning will, I think, be plain, and the fact that the press-roll has no mesh strengthens the argument, since the mesh can only be one introduced during the process. The conclusion I do not accept, that the pressure which "is repeated at intervals, first in layers when the separate coatings are applied," means the pressure between the press-rolls. The pressure of the press-rolls is continuous, nor "repeated at intervals," and it would be an extremely awkward way to describe the introduction of a mesh during the manufacture of the plate on such a press-roll by saying "with this paste a wire netting is coated, and the plate made by spreading in the same way as pasteboard."

The spreading machine referred to as a possible cardboard or pasteboard machine and as a "hand-dipping" machine was the old-fashioned way of making paper, by which the fluid was poured through a cloth or other mesh and the cloth then raised with the pulp upon it. It was suggested as a possibility that the paste in examples 1 and 3 might be made in some such machine. The mesh would be immersed in the paste and then raised up with the paste clinging about it. By repetition the plate would be built up. However that may be, it is too clear for argument that thin paste is used only in example 2, that the present cardboard machine can not be used with such paste, and that therefore the term "spreading or pasteboard machine" in example 3 cannot mean such a machine. There can be no question that the plates into which the mesh is to be introduced are the plates described in that example, not in example 2 which has been already fully described. In this case as before, the conclusion, right or wrong, is not inadvertent, and the proper relief to correct its errors is by appeal.

As the complainant has lost upon two claims, though he has succeeded on five, there can be no costs.