### ASBESTOS SHINGLE, SLATE & SHEATHING CO. et al. v. ROCK FIBRE MFG. CO.

(District Court, N. D. Illinois, E. D. September 23, 1914.)

#### No. 227.

1. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—PROCESS OF MAKING ARTIFICIAL STONE PLATES.

The Hatschek reissue patent, No. 12,594 (original No. 769,078), for a process of producing artificial stone plates or slabs by mixing asbestos fibers and hydraulic cement in a large bulk of water until the cement is reduced to a colloidal condition, and a pulp is formed which can be worked in a cardboard machine, then pressing the same and allowing the material to set or harden, and also for the product of such process, construed, and *held* valid and to cover a broad and meritorious invention. Also *held* infringed.

2. PATENTS (§ 165*)—CONSTRUCTION.

The claims of a patent should, if possible, always be given a scope that is commensurate with the real invention; the purpose of the patent law being to protect the inventor in his actual contribution to the useful arts.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 241; Dec. Dig. § 165.*]

In Equity. Suit by the Asbestos Shingle, Slate & Sheathing Company and Ludwig Hatschek against the Rock Fibre Manufacturing Company. On final hearing. Decree for complainants.

Edwards, Sager & Wooster, of New York City, and Heidman & Street, of Chicago, Ill., for plaintiffs.

Lothrop & Johnson, of St. Paul, Minn., for defendant.

BAKER, Circuit Judge (orally). [1] The bill is the usual one for the infringement of a patent. Complainant sues as the owner of the Hatschek patent, reissue No. 12,594, dated January 15, 1907, for the manufacture of imitation stone plates or slabs. The seven claims of the patent and the parts of the specifications which sufficiently disclose the invention read as follows:

"This invention relates to the production of artificial stone plates from hydraulic cement, e. g., Portland cement, Roman cement, hydraulic lime, or like cements which set with and under water. These stone plates have a great resisting power against atmospheric influences, and especially against water and change of temperature, and also against frost and mechanical blows.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

"The invention is carried into effect by mixing intimately fibrous material—such as asbestos, for example—in the presence of a great bulk of water with hydraulic cement, and by working up this watery mixture to plates of the desired thickness in the manner of the process of making cardboard. The cardboard-like plates obtained are then pressed under high pressure, whereby they may, if desired, be caused to receive any predetermined shape or appearance. After some time the product obtained becomes as hard as stone by the setting of the cement. The mixing of the materials to be employed and the working up of the mixture are preferably carried out in the usual machines for making cardboard or paper, whereby the quantity of water may be even larger than in making paper or cardboard.

"The process is based, as I have found, on the fact that in working a hydraulic cement with a large bulk of water and with the addition of fibrous material—e. g., asbestos—the setting or hardening power of the cement is not destroyed, and the hydraulic cement added slowly to the well-divided asbestos is intimately associated with the latter, so that no separation takes place, even if the weight of the cement amounts to four to nine times the weight of the asbestos. The water is and remains clear even after a long time. The hydraulic cement of the mixture seems to swell up, taking the appearance of a more or less colloidal, starch, or paste-like mass. These facts explain, perhaps, that such a mixture can undergo the working on the cardboard-machine without setting or hardening and without separation of the cement during this process, and that in consequence of the layer-like structure of the plates obtained they can be subjected to a very high pressure without causing any particles of the mass to be pressed out laterally. Only clear water escapes, and the plates retain their original dimensions apart from the thickness reduced by the pressure.

"In carrying out the process I disintegrate the desired quantity of fibrous material—e. g., asbestos—in the presence of water in such a way that the single fibers of the material are separated from each other. Then the hydraulic binding medium—e. g., hydraulic cement—is added and well intermingled and worked with large quantities of water, whereupon the mixture is immediately worked up in the usual way of making cardboard by means of cardboard-machines. In such a way it is possible to produce an article which contains 80 to 90 per cent. of cement with 20 to 10 per cent. of fibrous material.

"The carrying out of the process may be explained in a more detailed manner by the following example with the use of a well-known cardboard-machine: Into a mixing and disintegrating machine of about three to five cubic meters capacity 50 kilograms of asbestos are introduced. The asbestos, which is preferably previously disintegrated in an edge-mill, is subjected to the treatment in the said mixing-machine until it is sufficiently broken up; that is, until the fibers are as much as possible separated. Then the required proportion of the hydraulic cement—e. g., about two hundred and fifty kilograms—is gradually added, the entire bulk being mixed thoroughly. The mixture thus prepared is then caused to flow immediately into a vessel with a stirring device, the capacity of which vessel is preferably five to six times greater than that of the mixing-machine. The mixture is diluted with five to six times the quantity of water, the mixture being continuously agitated or stirred. From this vessel the thin paste is immediately conveyed to the cardboard-making machine in order to obtain a cardboard-like product. In the cardboard-making machine the thin paste containing the asbestos and hydraulic cement is thus conveyed to or upon an endless rotating porous fabric, through which the water of the thin paste or pulp flows off, leaving on the upper side the hydraulic cement intermixed with asbestos as a thin layer, which layer is conducted to a rotating roller, on which this layer is taken off from the said endless fabric and rolled up thereon. Thus a sheet is formed composed of several superimposed layers, the number of which layers corresponds to the number of rotations of said roller. As soon as the product thus obtained on the roller has reached the desired thickness the same is cut to the desired size and pressed to the desired shape, whereupon it is caused to set in suitable rooms."

"1. The process of rendering hydraulic cement colloidal, which consists in

working the same with a large bulk of water, that is to say, with sufficient water to allow the particles of cement to be kept in motion and thus segregated, whereby the setting or hardening power of the cement is not destroyed, and, in the presence of other material, as well-divided asbestos, it is intimately associated with the latter, so that even if the weight of the cement be greater than that of the material with which it is mixed, no separation takes place, substantially as set forth.

"2. The herein-described process of producing artificial-stone plates, consisting of first mixing fibrous material and hydraulic cement in the presence of a great bulk of water, then forming therefrom a series of thin layers of the mixed cement and fibrous material superposed on each other until the required thickness is secured, then pressing the same and allowing the material to set or harden.

"3. The herein-described process of producing artificial-stone plates, consisting of first mixing asbestos fibers and hydraulic cement in the presence of a great bulk of water, then forming therefrom a series of thin layers of the mixed cement and asbestos superposed on each other until the required thickness is secured, then pressing the same and allowing the material to set or harden, substantially as set forth.

"4. The herein-described process of producing artificial-stone plates, consisting in mixing fibrous material and hydraulic cement in a bulk of water sufficient to render the cement colloidal, then forming therefrom a series of thin layers of the mixed cement and fibrous material superposed on each other until the required thickness is secured, then pressing the same and allowing the material to set or harden.

"5. The herein-described process of producing artificial plates, consisting of first mixing fibrous material and hydraulic cement in the presence of a great bulk of water, to render the cement colloidal, then forming therefrom a series of thin layers of the mixed cement and fibrous material superposed on each other until the required thickness is secured, then pressing the same and allowing the material to set or harden.

"6. An artificial-stone product consisting of a major proportion of hydraulic cement and a minor proportion of fibrous material, the product being in layers and elastic, non-brittle and penetrable to nails, that is, capable of being nailed similar to paper building-board or wood, incombustible and water and frost resistant, of hardness, strength and durability, and having a certain quality of toughness which enables it to resist strains and shocks which would shatter ordinary brittle material, such as slate, and the product being finally, easily cut and sawed into shape and capable of being presented thin enough to serve as a substitute for wooden shingle and slate tile, etc., substantially as described.

"7. A product of the invention hereinbefore set forth, being a composition containing hydraulic cement which has been rendered colloidal."

The defenses are that claims 1 and 6 are invalid, and claims 2, 3, 4, 5, and 7 are not infringed.

I do not deem it necessary to refer particularly to the prior patents that have been introduced in evidence. They have been pretty thoroughly reviewed by Judge Hand in the case of this complainant (Asbestos Shingle & Sheathing Co. v. H. W. Johns-Manville Co. [C. C.] 184 Fed. 620; Id. [C. C.] 189 Fed. 608); and in the instant case no stronger presentation of the prior paper art has been made. The testimony which has been given orally leads me to find that prior to Hatschek's time no similar pulp-like product had ever been produced which is capable of being turned by paper-making processes into imitation stone plates or slabs. From this evidence I find that chemists had known more or less familiarly that cement might be converted into a colloidal or partially colloidal condition. So far as this fact had been established, it stood only as a laboratory fact. Hatschek was the first who ever brought it into the realm of the useful arts. And therefore

Hatschek is entitled to be ranked as a true inventor, just as in the Tesla Polyphase Motor Case (C. C.) 97 Fed. 588, the patent was sustained because Tesla was the first to bring into the useful arts the laboratory-known electrical principle of splitting and retarding phases. As to the ordinary processes in which grouting was used, or in which a thin mixture of cement might be thrown by a plasterer on a stucco house, I find as a fact that the cement particles had not advanced toward a colloidal condition to that degree which made it possible for any one to use it as pulp in the paper-making process. The testimony in this case establishes that through the Hatschek process practically a true colloidal condition is reached, because Dr. Sadtler in his experiments found that the cement after undergoing the Hatschek process would absorb dyes with as much readiness practically as would gelatine, thus tending to establish, by actual demonstration, that a true colloidal condition had been attained. There is no evidence in this record that otherwise than by the Hatschek process had cement particles ever been brought into a condition where they would absorb dyes as does gelatine.

Claim 1 of this patent I deem to be the most important. It covers the process of producing what may be called a pulp, which then is in a condition to be utilized by paper-making processes. The process covered by claim 1 is not merely for the general old process of mixing up cement with water, either with or without natural stone material, but it is for the process of working the cement in a large bulk of water, meaning thereby a larger quantity of water than had been used in prior practices in which cement had been employed, and working it in this large bulk of water in the presence of finely divided asbestos, divided so finely that each fiber is in the water separate from the other fibers, and carrying on a sufficiently prolonged agitation of the cement and the asbestos fibers in this large bulk of water until the particles of the cement have changed from their initial crystalline physical character to an amorphous condition in which the particles partake of a colloidal nature. This particular Hatschek process of rendering cement colloidal is aided by the presence of the asbestos fibers, these fibers assisting in separating and keeping separate the particles of cement, and helping to produce the final condition of having all the particles colloidal by taking up each particle of the cement as it is brought to a thoroughly colloidal condition.

While in the prior art undoubtedly a start was made toward what is known in this record as a colloidal condition, I regard Hatschek's process as not merely carrying forward a prior art. He accomplished something more than a change in degree. He brought about an absolutely new result. In this respect the present case seems to me quite similar to the Asperin Case decided by the Court of Appeals of this Circuit, in Kuehmsted v. Farbenfabriken of Elberfield Co., 179 Fed. 701, 103 C. C. A. 243. In that case, in one sense all the chemist Hoffman did was to make progress in the degree of purifying a product which was already known, but the purification was carried to the point where a deleterious substance was converted into a highly valuable medicinal product. So here the partial change toward colloidal condition that may occur in grouting and other prior uses of cement had never pro-

gressed to the point, and no one had thought that it might be carried to the point, where the hydraulic cement could be used as the binding material in holding fiber, so that the new mass could be worked like pulp upon paper-making machines.

Claim 7 covers the composition of the invention described in process claim 1, and is infringed by any product in which hydraulic cement has been brought into the colloidal state described in the patent, namely, a colloidal state brought about by working the cement with a large bulk of water, and in the presence of and association with asbestos or equivalent fibrous material.

Claim 6, in my judgment, is not to be stricken down as a mere duplication of claim 7. It certainly is not a duplication of claim 7 in words, and in substance it strikes me as being a narrower product claim than claim 7. Claim 7, as I have already indicated, covers in my judgment any product in which the pulp mixture of the Hatschek invention is used in any kind of paper-making process in producing artificial stone plates of slabs. Claim 6, however, is only for the product which results from the use of this pulp-like material upon the usual cardboard machine. This is indicated by the recital in claim 6 that the product is in layers, and this expression I attribute, by reason of the specification, to the operation of the cardboard machine.

There is virtually no contention that process claim 1 and product claims 6 and 7, as above construed, are not infringed.

This leaves claims 2, 3, 4, and 5. For purposes of this case these claims may be considered as essentially the same. No particular attack upon their validity has been made, the reliance of the defendant being upon the assertion of noninfringement. Each one of these claims defines a process consisting of first producing the pulp mixture, then forming from the pulp mixture a series of thin layers superimposed upon each other, and "then pressing the same and allowing the material to set or harden." In describing the process the inventor in the fourth above quoted paragraph of the specification requires that after the pulp mixture is prepared it shall be "worked up in the usual way of making cardboard by means of cardboard machines." At this point in the specification the inventor made no reference to any subsequent and independent pressure; no pressure beyond that exerted by the cardboard machine itself. In the second paragraph the inventor describes the same process for producing the pulp mixture and then working it up into plates according to the process for making cardboard, and then proceeds: "The cardboard-like plates obtained are then pressed under high pressure, whereby they may, if desired, be caused to receive any predetermined shape or appearance." From this expression it might be contended that the inventor had in mind that in every instance and for all purposes additional and independent pressure should be applied. And in the last above quoted paragraph the inventor, after describing the formation of the sheet, says:

"As soon as the product thus obtained on the roller has reached the desired thickness the same is cut to the desired size and pressed to the desired shape, whereupon it is caused to set in suitable rooms."

From this last expression it might be urged that, in his specifications at least, the inventor contemplated no additional and independent pressure unless it was desired to give the product some particular shape by means of pressure, such as corrugation and the like.

Taking the whole of the specification in connection with the unquestioned description of the actual method of manufacture pursued under the direction of the inventor himself, I have no difficulty in arriving at the conclusion that the inventor intended that there should be additional and independent pressure if that was necessary to produce a given form; that independent and additional pressure should be applied if it was desired that the product should have very unusual resisting strength, due to a higher degree of compactness than would be obtained through the pressure of the cardboard machine, and that he intended that in every instance there should be the degree of pressure that was suitable to the purpose to which the product was to be applied. In interior work the product does not need to have so great a consistency, so high a specific gravity, so dense a texture; and the requisite degree of pressure is supplied by the cardboard machine itself.

In the cardboard machine used by the defendant there are only the means of pressure that are present in all of the cardboard machines of the prior art. Machines used by the complainant and the defendant are substantially alike. But the pressure in the machine as it had been developed and as it stood for paper-making purposes was a pressure, according to the testimony produced orally before me, which had the end in view of expressing from the paper pulp the water as far as possible, in order that the paper or the cardboard might be handled more quickly commercially; in order that in many classes of cardboard and millboard there might be saving in freight. The pressure means that were put on paper-making machines were not put there to carry out the purposes for which Hatschek had pressure in mind.

[2] Pressure in Hatschek's process stands for the compacting of the materials in such a way that the effect of the pressure persists beyond the release of the pressure means. The Hatschek material, unlike the paper pulp, does not spring back at all on account of resiliency, for it has none. Pressure upon the Hatschek pulp leaves its permanent results, and compacts the product so it is held in the given density while the cement sets and hardens. While this is sufficiently plain to me from the evidence as to what has actually been accomplished, it remains true that the patentee may not hold an alleged infringer except in accordance with the terms of his claims. And it sometimes unfortunately happens that an invention, very clearly and accurately disclosed and described in the specification, is lost to a greater or less degree by reason of the ineptitude of the inventor's solicitor in framing the claims. But always claims should be given, if possible, a scope that is commensurate with the real invention. The object of the patent law is to protect the inventor, not in some paper ideal, but in his actual contribution to the useful arts. And here the contribution is of the highest order. This is not an improvement in an art, it is the foundation of a new art. No process of this kind, no manufacture like the complain-

'ant's, was known prior to Hatschek's time, and it is now known only by reason of Hatschek's genius and his disclosure to the world of the result of his labors. And so while I realize that a strictly literal reading of claims 2, 3, 4, and 5 might lead to an enlargement of this defendant from the charge of infringement, yet I believe that, when the nature of this invention is borne in mind, when it is further remembered that although a process claim is a description of the step by step means by which a particular result is achieved, yet it is possible for two steps to be taken concurrently instead of their always being required to go successively, the pressure specified in claims 2, 3, 4, and 5 should be held to include not only that pressure which is given to the Hatschek pulp independently and subsequently to its treatment upon the accumulator roll, but that, inasmuch as for many practical purposes no pressure is needed beyond the pressure that is exerted by the rolls of the machine, the pressure mentioned in these claims 2, 3, 4, and 5 likewise covers the pressure that is exerted by the pressure means of the cardboard machine. This is true in spite of the fact that no new pressure means are added to those present in the old paper-making art, because the old means of pressure were not used to bring about the necessary new kind of pressure, the pressure having a result upon this Hatschek pulp which the pressure of the cardboard-making machines never wrought upon the paper pulp.

Therefore I think that the complainant has not departed from claims 2, 3, 4, and 5 by proportioning the pressure to the desired density of the product, and that the defendant by abstaining from the extra pressure which is most desirable for some forms of the product has not escaped infringement of a single one of the claims of the patent. The defendant has appropriated the new and wonderful discovery that this stone thing, this hydraulic cement, could be used as paper pulp, and has appropriated the benefits that come from using the Hatschek pulp. And it would be a case of sticking in the bark, of adhering to the letter at the expense of the spirit of our patent laws, to permit the defendant to appropriate the fruits of an invention that is broad and meritorious and that lies at the foundation of an absolutely new industry.

A decree for the complainant will be entered in accordance with the prayer of the bill.